# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

**BENEFIT AMERICA, LLC**                                                      PLAINTIFF

v.                          CASE NO. 4:14cv0446-KGB

**UNIVERSAL FIDELITY LIFE INSURANCE CO.**                    DEFENDANT

## NOTICE OF REMOVAL

This case assigned to District Judge Baker
and to Magistrate Judge Kearney

COMES NOW, Universal Fidelity Life Insurance Co., Inc., ("UFLIC") by and

through its attorneys, Lax, Vaughan, Fortson, Jones & Rowe, P.A., and files this Notice

of Removal pursuant to 28 U.S.C. §1446(a) and in support thereof would respectfully

show the Court as follows:

### A. PROCEDURAL BACKGROUND

1.      On or about June 27, 2014, plaintiff filed its complaint in this action in the

Circuit Court of Pulaski County, Arkansas, Case No. 60CV-2014-2479 ("State Court

Action") alleging that defendant UFLIC breached a contract with the plaintiff pertaining

to the solicitation of insurance business.  Counsel for the defendant was provided a

courtesy copy of the complaint on June 30, 2014 and agreed to accept service of the

complaint.

2.      On July 24, 2014, the defendant filed an Answer to the complaint in the

State Court Action.

3.      This Notice of Removal is being filed within the thirty (30) days required

by 28 U.S.C. §1446(b).

## B. GROUNDS FOR REMOVAL

4.      The present suit is an action over which this Court has original jurisdiction

pursuant to 28 U.S.C. §1332(a)(1), as it is a civil action between citizens of different

states and the amount in controversy alleged in the complaint exceeds $75,000.00,

exclusive of interest and costs.   The plaintiff is an Arkansas limited liability company

with its principal place of business in Little Rock, Pulaski County, Arkansas.  The

defendant is an Oklahoma corporation with its principal place of business in Oklahoma

City, Oklahoma County, Oklahoma.

5.      This action may be removed to this Court by the defendant pursuant to the

provisions of 28 U.S.C. §1446(b).   Removal is proper pursuant to 28 U.S.C. §1441

because this Court has original jurisdiction over the action.

## C. COMPLIANCE WITH PROCEDURAL REQUIREMENTS

6.      Pursuant to 28 U.S.C. §1446(b), this Notice is being filed with this Court

within thirty (30) days after the defendant received a copy of plaintiff's initial pleading

setting forth the claims for relief upon which plaintiff's action against the defendant is

based.

7.      Pursuant to 28 U.S.C. §1446(a), venue of the removal action is proper in

the Eastern District of Arkansas, Western Division because it is in the district and

division embracing the place where the State Court Action is pending.

8.      Pursuant to 28 U.S.C. §1446(a), a copy of all process, pleadings asserting

causes of action, and orders, served upon the defendants and filed in the State Court

Action are attached as Exhibit A.

9.      Trial has not commenced in the Circuit Court of Pulaski County, Arkansas, under Cause No. 60CV-2014-2479.

10.      Promptly after the filing of this Notice of Removal, defendant will give written notice of the removal to the plaintiff and will file a copy of this Notice of Removal with the Circuit Court of Pulaski County, Arkansas as required by 28 U.S.C. §1446(d).

WHEREFORE, defendant Universal Fidelity Life Insurance Co., Inc. respectfully prays that the action be removed to this Court and that this Court assume full jurisdiction as if it had been originally filed here.

Respectfully submitted,

LAX, VAUGHAN, FORTSON,
    JONES & ROWE, P.A.
11300 Cantrell Road, Suite 201
Little Rock, Arkansas  72212
(501) 376-6565 *Office*
(501) 376-6666 *Facsimile*
rrowe@laxvaughan.com

By:      _____
            Roger D. Rowe (85140)
            *Attorneys for Respondent*

3

## CERTIFICATE OF SERVICE

A copy of the foregoing was served on the following interested party by placing a copy of same in the U. S. Mail, with first class postage affixed thereon, and addressed to:

Ashlea Brown
Joel F. Hoover
Newland & Associates, PLLC
2228 Cottondale Lane, Ste. 200
Little Rock, AR 72202

Dated: July _29_, 2014.

_____
Roger D. Rowe

*Multiple claims. If a complaint asserts multiple claims which involve different subject matter divisions of the circuit court, the cover sheet for that division which is most definitive of the nature of the case should be selected and completed.

ELECTRONICALLY FILED
2014-Jul-24 12:24:54
60CV-14-2479
C06D05 : 1 Page

# COVER SHEET
## STATE OF ARKANSAS
## CIRCUIT COURT: CIVIL

H  To Save a copy of this form to your computer, please click the disk icon on the toolbar above.

The civil reporting form and the information contained herein shall not be admissible as evidence in any court proceeding or replace or supplement the filing and service of pleadings, orders, or other papers as required by law or Supreme Court Rule. This form is required pursuant to Administrative Order Number 8. Instructions are located on the back of the form.

### FILING INFORMATION

County: Pulaski

District: _____

Docket Number: CV

Judge: _____

Division: _____

Filing Date: _____

Plaintiff: Benefit America, LLC

Defendant: Universal Fidelity Life Insurance Co.

Attorney Providing Information: Ashlea Brown
☒ Plaintiff    ☐ Defendant    ☐ Intervenor

2228 Cottondale Lane, Suite 200
Address

Litigant, if Pro Se: _____

Little Rock, AR 72202
Address

Related Case(s): Judge_____

Case Number(s) _____

### Type of Case:

**Torts**
- ☐ (NM) Negligence: Motor Vehicle
- ☐ (NO) Negligence: Other
- ☐ (BF) Bad Faith
- ☐ (FR) Fraud
- ☐ (MP) Malpractice
- ☐ (PL) Product Liability
- ☐ (OD) Other _____

**Contracts**
- ☐ (IS) Insurance
- ☐ (DO) Debt: Open Account
- ☐ (PN) Debt: Promissory Note
- ☐ (EM) Employment
- ☒ (OC) Other Breach of Contract _____

**Equity**
- ☐ (FC) Foreclosure
- ☐ (QT) Quiet Title
- ☐ (IJ) Injunction
- ☐ (PT) Partition
- ☐ (OT) Other _____

**Miscellaneous**
- ☐ (CD) Condemnation
- ☐ (RE) Replevin
- ☐ (DJ) Declaratory Judgment
- ☐ (UD) Unlawful Detainer
- ☐ (IN) Incorporation
- ☐ (EL) Election
- ☐ (FJ) Foreign Judgment
- ☐ (WT) Writs_____
- ☐ (AA) Administrative Appeal
- ☐ (CF) Property Forfeiture
- ☐ (RD) Remove Disabilities
- ☐ (NC) Name Change
- ☐ (OM) Other _____

**Jury Trial Requested:** ☒ Yes ☐ No

**Manner of Filing:** ☒ Original ☐ Re-open ☐ Transfer ☐ Return from Federal/Bankruptcy Court

## DISPOSITION INFORMATION

Disposition Date: _____    ☐ Bench Trial    ☐ Non-Trial    ☐ Jury Trial

**Judgment Type:**
- ☐ (DJ) Default Judgment
- ☐ (SJ) Summary Judgment
- ☐ (CJ) Consent Judgment
- ☐ (TJ) Trial Judgment
- ☐ (OJ) Other Judgment
- ☐ (PG) Petition Granted
- ☐ (PD) Petition Denied
- ☐ (DF) Decree of Foreclosure

**Dismissal Type:**
- ☐ (DW) Dismissed with Prejudice
- ☐ (DN) Dismissed without Prejudice

**Other:**
- ☐ (TR) Transferred to Another Jurisdiction
- ☐ (RB) Removed to Bankruptcy Court
- ☐ (RF) Removed to Federal Court
- ☐ (AR) Arbitration

**Judgment For:**
☐ Plaintiff    ☐ Defendant    ☐ Both

Judgment Amount: $ _____

Clerk's Signature
AOC 23  10-01
625 Marshall Street
Little Rock, AR 72201

Date _____

Send 1 paper or electronic copy to AOC upon filing.
Send 1 paper or electronic copy to AOC upon disposition.
Keep original in court file.

**Effective 1-1-2002**

THE CIRCUIT COURT OF _____ COUNTY, ARKANSAS

_____ DIVISION [Civil, Probate, etc.]

## Benefit America, LLC
Plaintiff

v.

No. _____

Universal Fidelity Life Insurance Co.

Defendant

SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

Universal Fidelity Life Insurance Co.

_____   [Defendant's name and address.]

_____

A lawsuit has been filed against you.  The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:____Newland & Associates, PLLC, 2228 Cottondale Lane, Suite 200, Little Rock, AR 72202____

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

CLERK OF COURT

Address of Clerk's Office

## 401 W. Markham

Little Rock, AR  72201
_____

_____
[Signature of Clerk or Deputy Clerk]

Date:_____

[SEAL]

**No. _____ This summons is for** _____ *(name of Defendant).*

**PROOF OF SERVICE**

☐ I personally delivered the summons and complaint to the individual at _____ _____[place] on _____ [date]; or

☐ I left the summons and complaint in the proximity of the individual by _____ _____ after he/she refused to receive it when I offered it to him/her; or

☐ I left the summons and complaint at the individual's dwelling house or usual place of abode at _____[address] with _____[name], a person at least 14 years of age who resides there, on _____[date]; or

☐ I delivered the summons and complaint to _____[name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____[name of defendant] on _____[date]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]: _____

☐ I was unable to execute service because: _____

_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____        SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____        By: _____
[Signature of server]

_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____

_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____



Arkansas Judiciary

**Case Title:**       BENEFIT AMERICA, LLC V UNIVERSAL FIDELITY
                       LIFE INS

**Case Number:**    60CV-14-2479

**Type:**             SUMMONS - FILER PREPARED

So Ordered

Crystal Hill

Electronically signed by CSHILL on 2014-06-27 12:55:25    page 4 of 4

ELECTRONICALLY FILED
2014-Jun-27  12:24:54
60CV-14-2479
C06D05 : 12 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
### _____ DIVISION

BENEFIT AMERICA, LLC                   **CLAIMANTS**

VS.           CASE NO. _____

UNIVERSAL FIDELITY LIFE INSURANCE CO.       **RESPONDENT**

### COMPLAINT

COMES NOW, Benefit America, LLC ("Benefit America"), by and through its attorneys, NEWLAND & ASSOCIATES, PLLC, and for its Demand for Arbitration against Universal Fidelity Life Insurance Company, state and allege as follows:

### I.    PARTIES, JURISDICTION, AND VENUE

1.    Benefit America's principal place of business is in Pulaski County, Arkansas.

2.    Upon information and belief, Universal Fidelity Life Insurance Company's ("Universal") principal place of business is in Oklahoma.

3.    Jurisdiction is proper pursuant to Ark. Code Ann. § 16-13-201.

4.    Venue is proper pursuant to Ark. Code Ann. § 16-55-213.

### II.    BACKGROUND

5.    On or about July 1, 2009, Universal entered into a Master General Broker Agreement with Benefit America, a copy of which is attached hereto as Exhibit A.

6.    Pursuant to said Master General Broker Agreement, Benefit America agreed to solicit administrative agreements on behalf of Universal for a product known as the Employers Choice Health Plan. _See_ Exhibit A, Section A.

7.    The Master General Broker Agreement requires Universal to pay Benefit America a specified fee for income generated as a result of Benefit America's services. _See_ Exhibit A, Section B.1.

8.      Schedule B of the Master General Broker Agreement states that the compensation due by Universal to Benefit America shall be 75% of the Operating Profit for thirty-six months from the date of the Master General Broker Agreement and will then decrease to 50% of the OP in **perpetuity.**

9.      Pursuant to Schedule B of the Master General Broker Agreement, Universal has a continuing duty to compensate Benefit America.

10.     Universal agreed to provide an accounting to Benefit America for the compensation due under the Master General Broker Agreement. *See* Exhibit A, Section E.1.

11.     Universal also agreed to provide to Benefit America a calculation of the amounts due to it on the twentieth day of each month, with the balance due to Benefit America to be paid by the thirtieth day of each month. *See* Exhibit A, Schedule B.

12.     Universal also agreed to reimburse Benefit America for the payroll of sales employees. *See* Exhibit A, Section B.4.

13.     Benefit America performed valuable services for Universal pursuant to the Master General Broker Agreement.  Despite demand, Universal has failed and refused to provide an accounting to Benefit America for the compensation due under the Master General Broker Agreement.

14.     Upon information and belief, Universal owes Benefit America in excess of $100,000 as compensation for Benefit America's services, and amounts continue to accrue.

15.     In addition, Benefit America remitted payroll to two sales employees, but Universal has failed and refused to reimburse Benefit America for such payroll in the amount of $100,052.

## COUNT I – BREACH OF MASTER GENERAL BROKER AGREEMENT

16.     Benefit America incorporates by reference all allegations contained in Paragraphs 1 through 15 as if set forth word for word herein.

17.     Universal breached the Master General Broker Agreement by failing to provide an accounting to Benefit America and failing to pay Benefit America all compensation due.

18.     Upon information and belief, Universal Fidelity owes Benefit America in excess of $100,000 for compensation for the services that Benefit America provided, and amounts continue to accrue.

19.     Because Universal has not provided accountings to Benefit America as required by the Master General Broker Agreement, Benefit America reserves the right to amend its damage calculation.

20.     In addition, Universal breached the Master General Broker Agreement by failing to reimburse Benefit America $100,052 for payroll to two sales employees.

21.     Benefit America is entitled to a judgment against Universal for Universal's breach of the Master General Broker Agreement.

## COUNT II – UNJUST ENRICHMENT

22.     Benefit America incorporates by reference all allegations contained in Paragraphs 1 through 22 as if set forth word for word herein.

23.     Benefit America provided valuable services to Universal with the reasonable expectation that it would be compensated for such services.

24.     Universal benefited from Benefit America's services, but has not compensated Benefit America.

25.     Universal knew that Benefit America was providing valuable services.

26.     Universal accepted the valuable services under such circumstances that make it inequitable for Universal to retain the benefit without payment to Benefit America.

27.     Namely, Universal obtained new business and income as a result of Benefit America's services.

28.     Universal has been unjustly enriched by the services that Benefit America provided to it.

29.     Benefit America is entitled to an award against Universal for the value of the services Benefit America provided to Universal.

WHEREFORE, Claimant, Benefit America, LLC requests the relief specified herein, including its costs and attorneys' fees, and for all other just and proper relief to which they may be entitled.

Respectfully Submitted,

NEWLAND & ASSOCIATES, PLLC
2228 Cottondale Lane, Suite 200
Little Rock, AR 72202
(501) 221-9393

Ashlea Brown, Ark. Bar No. 2007197
Joel F. Hoover, Ark. Bar No. 2001031

(4)

## Master General Broker Agreement

This Agreement is made this 1st day of July, 2009 by and between Universal Fidelity Life Insurance Co. located at 149208 Hertz Quail Springs Parkway, Oklahoma City, OK 73134, an Oklahoma Corporation hereinafter designated as "Company" and Benefit America, LLC, an Arkansas Limited Liability Company with principal business at 10 Corporate Hill Drive, Suite 330, Little Rock, AR, 72205 hereinafter designated as "Master General Broker or MGB." This agreement pertains exclusively to products administered by the Company and known as the Employers Choice Health Plan hereafter designated as "ECHP" and related life, dental, and vision insurance.

The Parties agree as follows:

A.   **ENGAGEMENT.** The Company hereby exclusively contracts with the MGB to solicit both directly and through General Brokers and Brokers, administrative agreements for the ECHP group programs and pursuant to Company's administrative agreements, with Pan American Life Insurance Company and other insurance companies, applications designated "Insurance, Reinsurance, Stop Loss, or Excess Loss coverage", which also includes sales to Employers participating in the ECHP program of life, dental, and vision programs in geographical areas designated in the attached Compensation and Product Schedule.

B.   **COMPENSATION.**

1.   **For Each Product.** MGB's compensation depends on the particular Products sold. Compensation for each Product will be as specified in compensation and product Schedules A and B attached and subject to administrative agreements with Pan American Life Insurance Company which defines available commissions for Producers. Compensation and Product Schedules for new business may be changed by mutual agreement of Company and the MGB. MGB may pay a portion of the compensation to a subordinate recruited Broker. MGB's compensation will be reduced by the amount of compensation paid to any subordinate Broker and Company if any.

2.   **Contingencies.** In addition to any conditions imposed in the Compensation and Product Schedules and any amendments, no compensation is earned until:

   (a) MGB is licensed, in good standing under State laws as a legal entity and appointed in accordance with laws and Company procedures,

   (b) The Product is actually issued, delivered to and accepted by the customer, and

   (c) The premium and or program charge for the Product is paid to the Company and considered earned, "as earned basis".

3.   **Compensation After Termination.** MGB shall not be entitled to any compensation after the Termination Date of this Agreement, except for:

   (a) Vested Compensation, and

1



(b) Any net credit balance after offset of any debit items in MGB's account for compensation earned as of the Termination Date.

4. **Recruited Broker Compensation.** The Company and the MGB agree to not issue contracts with retail brokers for more than 6% commission. The Company will facilitate payments to MGB recruited brokers through the Company administration system.

5. **Company Marketing Employee Compensation.** MGB gross compensation may include marketing compensation to certain Company employees licensed as agents as agreed upon by the Company and MGB. In no event however shall Company employees be compensated by commission on policies issued by Company.

## C.   MGB'S DUTIES.

1. **Licenses and Approvals.** MGB shall obtain and maintain and provide copies of all necessary licenses and regulatory approvals to perform the services under this Agreement. The MGB shall oversee the licensing process and determine that all recruited Brokers are properly licensed and appointed. The Company shall assist MGB and perform administrative duties as required.

2. **Recruit, Instruct, Supervise, Operate.** MGB may recruit Brokers, and shall instruct and supervise such recruits in the marketing of Products. The MGB will adequately train each new recruit making sure that the recruit has an adequate working knowledge of self insurance, stop loss and excess loss plans as they relate to their marketing efforts of the ECHP.

3. **Business Development.** MGB shall advance, protect and conduct its business in the best interests of the Company as a fiduciary, such duties to include but not limited to facilitating agreements, contracts, and treaties with appropriate parties with the Programs, primary or fronting insurance companies, and reinsurance or excess loss insurance companies in a manner that will promote the business interests of the Company.

The MGB shall also have the following operational responsibilities:

a) To solicit applications for Insurance both directly and through recruited Brokers and upon completion of applications, make known to the company not only the information contained in the applications, but all information that may be discussed with the prospect or recruit concerning any area that may have an affect on the underwriting or the insurability of any potential participant.

b) To make the following information known to employer prospects when presenting reinsurance / stop loss products and / or the Employers Choice Health Plan (ECHP), 1) the ECHP is a self insured plan that requires the employer to retain the risk associated with the benefit offered; 2) the employer may purchase reinsurance / stop loss coverage

2

2. **Alteration.** Alter any advertising materials or make, alter, waive or discharge any contracts or Products on behalf of Company.

3. **Premium Payments and Reinstatement.** Extend the time for payment of any premium or waive any premium, or bind Company to reinstate any terminated contract, or accept payment in any form other than a customer check or money order payable to the Company or other method authorized by Company.

4. **Respond in Connection with Proceeding.** Institute or file a response to any litigation or regulatory proceeding on behalf of Company in connection with any matter pertaining to this Agreement or any Product, without Company's prior written consent.

5. **Replacement.** Replace any existing insurance product unless the replacement is in compliance with all applicable laws and regulations and is in the best interest of the customer. The decision whether to replace an insurance product should be made by the customer. To help the customer make a decision regarding any proposed replacement, MGB must provide the customer with full written disclosure (both positive and negative) of all relevant information.

6. **Misrepresentation.** Misrepresent or induce any Broker Agent to misrepresent, any provision, benefit, or premium of any Product.

E. **COMPENSATION ADMINISTRATION.**

1. **Accounting.** Company will account to MGB for compensation based upon initial and renewal premiums, administrative fees and program fees received, and accepted by Company for policies issued upon applications submitted by or through MGB. Company reserves the right to freeze MGB's account for a reasonable period of time to ensure that funds are available to reimburse the Company for any Indebtedness.

2. **Effect of Return of Premium and Fees.** If any premiums or revenue shall be returned by Company on any policy or contract, or should Company become liable for the return thereof for any cause either before or after the Termination Date, MGB shall pay to Company all compensation previously paid or credited to MGB's account on such returned premium or revenue.

3. **Set-off.** Company is authorized to set-off and apply any and all amounts due to MGB from Company under this Agreement to any and all obligations or Indebtedness of MGB or its employees, Broker Agents or affiliates to Company or its affiliates. This right of set-off does not require company to make any prior demand upon MGB, and the right exists irrespective of whether the obligations of MGB or its affiliates are contingent or unmatured. The rights of the Company under this Section E.3 are in addition to any other rights and remedies which the Company may have under this Agreement or otherwise.

5

4.   **Interest.** Interest will accrue on any amount due under this Agreement, which has not been paid within thirty days of receipt of written demand for such amount at the rate of one percent per month, or the highest rate permitted by law, whichever is lower.

5.   **Limitation of Compensation Actions.** Any claim by MGB regarding compensation must be brought within one year from the date the compensation was reported on an accounting issued from Company to MGB. Any claim regarding compensation must be brought against the entity, which issued the Compensation and Product Schedule to which the claim relates.

F.   **TERMINATION WITH OR WITHOUT CAUSE.** In addition to any other termination provisions set forth, MGB or Company shall have the right at any time to terminate this Agreement, with cause or without cause, upon Thirty (30) days written notice to the other party.

Company shall have the immediate right of Termination upon written notice if one or more of the following events occur: 1) the Company loses the privilege of using the issuing carrier and is unable to find another suitable issuer for the ECHP; 2) the Company loses licensure or for any other regulatory reason loses the ability to handle the ECHP; 3) if the Company becomes bankrupt; 4) MGB loses licensure or for any other regulatory reason loses the ability to handle the ECHP; 5) if MGB becomes bankrupt; 6) if MGB at any time upon notice for cause, such as but not limited to fraud, misconduct, or failure of the MGB to comply with the terms of this Agreement, or if the MGB withholds money or documents belonging to the Company for which the Company has made demand; 7) on the effective date of sale, transfer or merger of the MGB's business or otherwise provided, however, the Company may offer an Agreement to any successor who meets the Company's requirements; 8) if any significant change in principals of the MGB occurs, unless approved in writing by the Company and/or the successor meets the Company's requirements. Termination shall be effective as later of the date of the event noted or the termination date. Termination will only affect new business compensation and not business produced prior to the termination date except for fraud or legal misconduct as noted in 6 herein and elsewhere.

G.   **INDEPENDENT CONTRACTOR.** MGB is an independent contractor in relationship to this agreement and not an employee of Company. Subject to legal and regulatory requirements, MGB shall be free to exercise MGB's own judgment as to the persons from whom MGB will solicit and the time and place of such solicitation as well as the manner and operation of activities within this agreement.

H.   **INSPECTION OF BOOKS AND RECORDS.** Company shall have the right during normal business hours and with reasonable notice, to inspect, audit and make copies from the books and records of the MGB for the purpose of verifying MGB's compliance with the provisions of this Agreement.

I.   **INDEMNITY AND HOLD HARMLESS.** Each party shall indemnify and hold the other party harmless from any liability, loss, costs, expenses (including reasonable attorneys' fees incurred by the indemnified party) or damages, including punitive and extra-

6

contractual damages, resulting from any act or omission by the indemnifying party or any of its employees or Brokers in the performance of its duties under this Agreement or other agreements with Company, including, without limitation, any breach of its obligations provided in this Agreement.

**J.     GENERAL.**

1.     **Issue and Product Type.** Company shall retain the right to decide whether to issue or withdraw its participation with ECHP or a Product, to establish a minimum rate for the product and determine the type of Product to be issued or withdrawn. Company may discontinue or change ECHP or a Product at any time.

2.     **Producer of Record.** The producer of record for any product shall be determined by Company records. Company reserves the right to change the producer of record according to Company procedures and shall have no obligation to designate a successor producer of record.

3.     **Notice.** Any notice required or permitted to be sent to Company or MGB under this Agreement shall be delivered personally or sent by U.S. Mail with all postage prepaid or by express mail to the following address or such other address provided by Company:   Universal Fidelity Ins. Co.; 14920 Hertz Quail Springs Parkway, Oklahoma City, OK, 73134 or to MGB: Benefit America, LLC; 10 Corporate Hill Drive, Suite 330, Little Rock, AR 72205.

4.     **Entire Agreement.** This Agreement, the Confidentiality and Privacy Amendment and the Compensation and Product Schedules constitute the entire agreement between the parties regarding the Products sold under this Agreement.

5.     **Governing Law.** This Agreement shall be governed by the laws of the State of Oklahoma.

6.     **Arbitration.** As a condition precedent to any right of action hereunder, it is agreed that in the event of any dispute or difference hereunder arising with reference to any transaction under this Agreement, whether arising before or after termination of this Agreement, the same shall be referred to two Arbitrators, one picked by the Company, the other by MGB. If either MGB or Company fails to designate to the other an Arbitrator after 30 days notice by the other party, then the party having chosen an Arbitrator shall pick the second Arbitrator.  The Arbitrators shall pick a third Arbitrator and abide by the procedures of the American Arbitration Association and their written decision or that of the majority of them shall be final and binding on the contracting parties without appeal.  Any such arbitration shall take place in the State of Oklahoma unless otherwise agreed.  The entire expense shall be equally divided between the MGB and the Company.  This provision shall not be a subject of arbitration.

7.     **Severability.** In the event any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions shall remain in effect.

8.    **No Waiver.** Failure of Company to enforce any provision of this Agreement shall not operate to waive or modify such provision or render such provision unenforceable.

9.    **No Assignment or Change.** Except for Compensation/Product Schedules, Confidentiality and Privacy Amendments and other amendments to the Agreement, which are required by federal, state or local laws or regulations, no modification, amendment or assignment of this Agreement shall be valid unless approved by mutual agreement. Compensation/Product Schedules, Confidentiality and Privacy Amendments and other amendments to the Agreement which are required by federal, state or local laws or regulations may be distributed only by Company but need not be signed by either party to be effective.

10.   **Survival.** MGB's appointment pursuant to this Agreement shall immediately terminate on the Termination Date. Except for Sections C.2 and C.3 of this Agreement, all other provision of this Agreement shall survive its termination.

11.   **Beneficiary.** If MGB is an individual, then MGB designates the beneficiary specified on the signature page or such other party or parties as MGB may designate by written notice delivered to and recorded by Company, as beneficiary for payment of any compensation becoming due after MGB's death.

12.   **Headings.** Any section or other heading contained in this Agreement are for reference purposes and convenience only and shall not affect, in any way, the meaning and interpretation of this Agreement.

13.   **Implementation.** Payments under this Agreement are contingent upon and subject to the successful execution of Third Party Administration Agreements and other agreements as necessary to the Company's satisfaction to implement the ECHP and other Programs with employer groups, insurance carriers and other contracts as required by the Company to obtain the benefits of marketing the Programs.

14.   **Client Termination.** The Company reserves the right to terminate any individual client participating in ECHP in accordance with contracts in effect at any time. In the event of such action, the Company shall notify the MGB of the termination.

15.   **MGB Performance.** MGB agrees that fraud, malfeasance, misappropriation, withholding of funds by MGB, MGB's willful neglect of any duty or obligation required by this Agreement, non-delivery of product and/or certificates, the retention of any property of the Company after demand is made by the Company or its authorized representative, or failure to service employer accounts shall result in forfeiture of any and all service fees of every kind that may be due to the MGB under this Agreement;

16.   **Additional Agreements.** Each Party shall execute, acknowledge and deliver such additional documents, writings or assurances as the other may periodically require so as giving full force and effect to the terms and provisions of the Agreement.

8

17.  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute but one and the same Instrument.

**K.**   **DEFINITIONS.**  The following terms have the following meanings.  Any singular word shall include any plural of the same word.

1.  **"Authorized Representative"** means the President of a Company or an Individual authorized in writing by the President.

2.  **"Compensation and Product Schedule"** means a Company's distributed commission and compensation schedule that (a) specifies the amounts and conditions under which commissions and compensation will be due and payable to MGB for any Product, and (b) is made a part of this Agreement.

3.  **"General Broker and Broker"** means any individual or organization, which (a) enters into a general broker or broker or other marketing agreement with the MGB and (b) submits Product applications that designate the MGB as the recruiting source and (C) is properly licensed and appointed.

4.  **"Indebtedness"** means any amounts owed by MGB to Company, including but not limited to (a) the chargeback of any compensation paid or credited to MGB under this or any other Agreement, if the monies on which such compensation was based are not collected or are refunded by the Company (b) any advances made by Company to MGB, (c) any expenses incurred by the Company on behalf of MGB, and (d) any amount paid by the Company, which in its determination resulted from fraud, misrepresentation or other improper conduct by the MGB.

5.  **"Product"** means any insurance policy, contract, investment vehicle or other offering identified in any Compensation and Product Schedule.

6.  **"Termination Date"** means the later to occur of (a) the date on which MGB or Company sends written notice of termination to the other party or (b) the date specified by MGB or Company in a written notice of termination to the other party.

7.  **"Vested Compensation"** means compensation identified as vested on a Compensation/Product Schedule and that may be paid to MGB after the Termination Date if (a) the policy related to the Product remains in force, (b) the premiums and program charges for the policy are paid to the Company, and (c) if MGB is the override agents or writing agent, MGB or MGB's recruited agent must also remain the producer of record.

**EXECUTION:**
IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below.

On Behalf of:
BENEFIT AMERICA, LLC

_____  J. Matt Pruett  7-11-09
Member                                          Date

On Behalf of:
UNIVERSAL FIDELITY LIFE INSURANCE CO. INC.

_____  7/11/9
Company Officer                            Date

9

## Schedule B
## Administrative Business Development Schedule

**Effective Date of the Agreement and Addendum is July 1, 2009**

**Program:**   Employers Choice Health Plans, MedRx, American Denticare and Employers Choice Health Alliance and other single employer self insured plans (collectively the "Programs")

**Geographic Area:**   United States where Programs are approved and allowed by regulatory agencies, subject to Company approval.

**Compensation Levels, Terms and Conditions:**

The Master General Broker will receive a percentage of the Administrative Operating Profit ("OP") derived from the Programs described herein produced according to the following:

1. OP is defined as Fee and Commission Income derived from the Programs less expense incurred as a result of the Programs. Expenses shall include those incurred to sustain an office and employees in Little Rock, Arkansas and those expenses incurred by Company in administering and selling the Programs and Products including commission on fees and premiums as described in Schedule A of this Agreement.

2. As compensation for fees produced for the Company, MGB earnings will be 75% of the OP for thirty six (36) months from the date of this Agreement and will then decrease to 50% of OP in perpetuity. On the 20th of each month a calculation shall occur for the previous month and the balance due to the MGB will be paid by the 30th day of the month. If the cumulative OP profit from Program inception is negative or a loss then no payment will be made until the total cumulative OP is greater than zero or profitable.

3. A budget of expenses described in item 1 will be developed by the Parties and mutually agreed to in writing. Changes to the budget must be mutually agreed to in writing by the Parties. If there is no agreements then the MGB and Company agree to arbitrate pursuant to the Master General Broker Agreement of which this Schedule B is a part.

4. Company shall prepare monthly financial statements for the Programs no later than 20 days of month end. Each Party shall have 30 days from month's end to dispute or question the accounting. After the 30 days without challenge, the accounting becomes final and agreed to by each respective Party.

5. Incidental use of employees and resources from Company or from Program budgeted resources shall not be accounted for as a due to or from the Program until such time as they are readily ascertainable, not nominal in amount and/or are expected to be ongoing.

6. Payments under this Agreement are contingent upon and subject to the successful execution of Third Party Administrative agreements and other agreements as necessary to the Company's satisfaction to implement the Programs with employer groups, insurance carriers and other contracts as required by the Company to obtain the benefits of marketing the Programs.

7. Any other business opportunities the Parties may decide to pursue together shall be subject to a separate agreement with terms and conditions related to the particular situation.
   IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below.

On Behalf of:
BENEFIT AMERICA, LLC

_____   _____
Member                                    Date

On Behalf of:
UNIVERSAL FIDELITY LIFE INSURANCE CO, INC.

_____   _____
Company Officer                        Date

11

ELECTRONICALLY FILED
2014-Jul-24  16:00:32
60CV-14-2479
C06D05 : 7 Pages

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
5TH DIVISION

BENEFIT AMERICA, LLC                                            PLAINTIFF

v.                         CASE NO. 60CV-14-2479

UNIVERSAL FIDELITY LIFE INSURANCE CO.              DEFENDANT·

ANSWER

COMES NOW the Defendant, Universal Fidelity Life Insurance Co., Inc., by and through its attorneys, Lax, Vaughan, Fortson, Jones & Rowe, P.A., and for its Answer to the Complaint filed in this action, states as follows:

1.      Defendant admits the allegations in paragraph 1 of the complaint.

2.      Defendant admits the allegations in paragraph 2 of the Complaint.

3.      Defendant admits the allegations in paragraph 3 of the Complaint, subject to the parties' agreement to arbitrate the claims alleged in this action pursuant to the rules of the American Arbitration Association and in the state of Oklahoma.

4.      Defendant admits the allegations in paragraph 4 of the Complaint, subject to the parties' agreement to arbitrate the claims alleged in this action pursuant to the rules of the American Arbitration Association and in the state of Oklahoma.

5.      Defendant admits only that the parties entered into a Master General Broker Agreement ("MGBA") on or about July 1, 2009 and denies all other allegations in paragraph 5 of the Complaint. Defendant states affirmatively that Exhibit A to the Complaint is a partial and incomplete copy of the MGBA. A complete copy of the executed MGBA is attached hereto as Exhibit 1. Defendant further states affirmatively

that the managing member and alter ego of the plaintiff, J. Matt Lile, informed defendant by email on July 21, 2009 that he (Mr. Lile) had executed Exhibit 1 without any corporate authority and asked the defendant to shred the document. The parties did not perform under the MGBA before Mr. Lile gave notice that it was executed without authority and was a nullity.

6.      Defendant denies the allegations in paragraph 6 of the Complaint and states affirmatively that the MGBA speaks for itself.

7.      Defendant denies the allegations in paragraph 7 of the Complaint and states affirmatively that the MGBA speaks for itself.

8.      Defendant denies the allegations in paragraph 8 of the Complaint and states affirmatively that the MGBA speaks for itself.

9.      Defendant denies the allegations in paragraph 9 of the Complaint and states affirmatively that the MGBA speaks for itself. Defendant states affirmatively that the compensation provisions in the MGBA are, among other things, contingent on plaintiff being licensed as an insurance agency in Arkansas and appointed by the insurance company participating in the Employers Choice Health Plan program described in the MBGA, namely Pan American Life Insurance Company. The plaintiff was unable to achieve the requisite licensure or appointment.

10.     Defendant denies the allegations in paragraph 10 of the Complaint and states affirmatively that the MGBA speaks for itself.

11.     Defendant denies the allegations in paragraph 11 of the Complaint and states affirmatively that the MGBA speaks for itself.

2

12.     Defendant denies the allegations in paragraph 12 of the Complaint and states affirmatively that the MGBA speaks for itself.

13.     Defendant denies the allegations in paragraph 13 of the Complaint.

14.     Defendant denies the allegations in paragraph 14 of the Complaint.

15.     Defendant denies the allegations in paragraph 15 of the Complaint.

**COUNT I – BREACH OF MASTER GENERAL BROKER AGREEMENT**

16.     Defendant incorporates and re-alleges each and every response stated in paragraphs 1-15 of this answer to the Complaint.

17.     Defendant denies the allegations in paragraph 17 of the Complaint.

18.     Defendant denies the allegations in paragraph 18 of the Complaint.

19.     Defendant denies the allegations in paragraph 19 of the Complaint.

20.     Defendant denies the allegations in paragraph 20 of the Complaint.

21.     Defendant denies the allegations in paragraph 21 of the Complaint.

**COUNT II – UNJUST ENRICHMENT**

22.     Defendant incorporates and re-alleges each and every response stated in paragraphs 1-21 of this answer to the Complaint.

23.     Defendant denies the allegations in paragraph 23 of the Complaint.

24.     Defendant denies the allegations in paragraph 24 of the Complaint.

25.     Defendant denies the allegations in paragraph 25 of the Complaint.

26.     Defendant denies the allegations in paragraph 26 of the Complaint.

27.     Defendant denies the allegations in paragraph 27 of the Complaint.

28.     Defendant denies the allegations in paragraph 28 of the Complaint.

29.     Defendant denies the allegations in paragraph 29 of the Complaint.

30.     Defendant denies each and every allegation not specifically admitted herein.

## AFFIRMATIVE DEFENSES

31.     Defendant states affirmatively that the alleged claim of unjust enrichment is unavailable where the parties have entered into a contract on the same subject.

32.     Defendant states affirmatively, and hereby provides notice pursuant to Ark. R. Civ. P. 44.1, that the MGBA is governed by the laws of the State of Oklahoma, and those laws should be applied to plaintiff's claims.

33.     Defendant states affirmatively that plaintiff's claims should be compelled to arbitration pursuant to the mandatory, binding arbitration clause in Section J, paragraph 6, of the MGBA.

34.     Defendant states affirmatively that all claims by the plaintiff for compensation under the MGBA that were not brought within one year from the date the compensation was reported on accounting issued by the defendant are barred by the period of limitations agreed upon in Section E, paragraph 5, of the MGBA.  All claims by the plaintiff that were not brought within the applicable Oklahoma period of limitations are barred.

35.     Defendant states affirmatively that the parties did not perform under the first version of the MGBA before the plaintiff's managing member and alter ego, Mr. Lile, gave notice on July 21, 2009 that it was executed without authority and was a nullity. Thereafter, on August 3, 2009, Mr. Lile sent defendant another MGBA that purportedly had been executed by his attorney and asked defendant to executed and return the MGBA. Upon information and belief, the defendant did not execute the

4

replacement MGBA, a copy of which is attached as **Exhibit 2**. The defendant subsequently learned that Mr. Lile surrendered his resident life and health insurance producer and agency license to the Arkansas Insurance Department on August 12, 2009, leaving the plaintiff with no licensure or possibility of licensure and unable to perform the MBGA. A copy of a Consent Order entered into by Mr. Lile with the Arkansas Insurance Commissioner is attached as **Exhibit 3**. Mr. Lile was subsequently indicted by the United States Attorney for the Eastern District of Arkansas on two counts of embezzlement from one of the companies whose insolvency and receivership was recited in the Consent Order.

36.     Defendant states affirmatively that the MGBA pertained exclusively to Employers Choice Health Plans, which the plaintiff was to solicit, directly or indirectly through licensed brokers, along with the insurance, reinsurance, stop loss insurance, and excess coverage insurance related to the life, dental, and vision insurance provided under the plans. The plaintiff could not perform its obligations under the MGBA without an insurance agency license. The MGBA presented as a validly executed agreement by Mr. Lile on behalf of the plaintiff, and attached as Exhibit 2, was not, upon information and belief, executed by the defendant and was not performed by the parties. The parties also never prepared any accountings, budgets or schedules of vested compensation required by the MGBA. The defendant should therefore be discharged from any and all obligations under the MGBA.

37.     Defendant states affirmatively that the plaintiff failed to satisfy contingencies to the receipt of any compensation under the MGBA, including but not

limited to, licensure as an insurance agency in Arkansas and appointment by the insurance company identified in the MGBA, Pan American Life Insurance Company.

38.    Defendant states affirmatively that the plaintiff assigned any rights to compensation under the MGBA to licensed insurance agencies, including Smart Benefits Consulting, LLC and Benamcon, LLC. The plaintiff therefore lacks standing to maintain this action.

39.    Defendant states affirmatively that it was impossible for the plaintiff to perform under the MGBA because it was not licensed by the Arkansas Insurance Department and was not appointed as an agent of the insurance company participating in the Employers Choice Health Plan program described in the MGBA, namely Pan American Life Insurance Company. The defendant should therefore be discharged from any and all obligations under the MGBA.

40.    Defendant states affirmatively that plaintiff lacks standing to maintain this action by reason of the revocation of its charter by the Arkansas Secretary of State.

41.    Defendant specifically reserves the right to amend its answer to the complaint as necessary, and to plead additional defenses and counterclaims upon further investigation and discovery.

WHEREFORE, Defendant Universal Fidelity Life Insurance Co., Inc. respectfully prays that the claimant's complaint be dismissed, for its costs and attorneys' fees, and for all other just and proper relief to which it may be entitled.

6

Respectfully submitted,

LAX, VAUGHAN, FORTSON,
    JONES & ROWE, P.A.
11300 Cantrell Road, Suite 201
Little Rock, Arkansas  72212
(501) 376-6565 *Office*
(501) 376-6666 *Facsimile*
rrowe@laxvaughan.com

By: _____
Roger D. Rowe (85140)
*Attorneys for Defendant*


## CERTIFICATE OF SERVICE

A copy of the foregoing was electronically filed on this 2??? day of July 2014, and served on the following interested party by placing a copy of same in the U. S. Mail, with first class postage affixed thereon, and addressed to:

Ashlea Brown
Joel F. Hoover
Newland & Associates, PLLC
2228 Cottondale Lane, Ste. 200
Little Rock, AR 72202

_____
Roger D. Rowe

7

ELECTRONICALLY FILED
2014-Jul-24 16:00:32
60CV-14-2479
C06D05 : 13 Pages

### Master General Broker Agreement

This Agreement is made this 1st day of July, 2009 by and between Universal Fidelity Life Insurance Co. located at 149208 Hertz Quail Springs Parkway, Oklahoma City, OK 73134, an Oklahoma Corporation hereinafter designated as "Company" and Benefit America, LLC, an Arkansas Limited Liability Company with principal business at 10 Corporate Hill Drive, Suite 330, Little Rock, AR 72205 hereinafter designated as "Master General Broker or MGB." This agreement pertains exclusively to products administered by the Company and known as the Employers Choice Health Plan hereafter designated as "ECHP" and related life, dental, and vision insurance.

The Parties agree as follows:

**A.**   **ENGAGEMENT.** The Company hereby exclusively contracts with the MGB to solicit both directly and through General Brokers and Brokers, administrative agreements for the ECHP group programs and pursuant to Company's administrative agreements, with Pan American Life Insurance Company and other insurance companies, applications designated "Insurance, Reinsurance, Stop Loss, or Excess Loss coverage", which also includes sales to Employers participating in the ECHP program of life, dental, and vision programs in geographical areas designated in the attached Compensation and Product Schedule.

**B.**   **COMPENSATION.**

1.   For Each Product, MGB's compensation depends on the particular Products sold. Compensation for each Product will be as specified in compensation and product Schedules A and B attached and subject to administrative agreements with Pan American Life Insurance Company which defines available commissions for Producers. Compensation and Product Schedules for new business may be changed by mutual agreement of Company and the MGB. MGB may pay a portion of the compensation to a subordinate recruited Broker. MGB's compensation will be reduced by the amount of compensation paid to any subordinate Broker and Company if any.

2.   **Contingencies.** In addition to any conditions imposed in the Compensation and Product Schedules and any amendments, no compensation is earned until:

(a) MGB is licensed, in good standing under State laws as a legal entity and appointed in accordance with laws and Company procedures,

(b) The Product is actually issued, delivered to and accepted by the customer, and

(c) The premium and or program charge for the Product is paid to the Company and considered earned, "as earned basis".

3.   **Compensation After Termination.** MGB shall not be entitled to any compensation after the Termination Date of this Agreement, except for:

(a) Vested Compensation, and

1

**EXHIBIT**

1

(b) Any net credit balance after offset of any debit items in MGB's account for compensation earned as of the Termination Date.

4. **Recruited Broker Compensation.** The Company and the MGB agree to not issue contracts with retail brokers for more than 6% commission. The Company will facilitate payments to MGB recruited brokers through the Company administration system.

5. **Company Marketing Employee Compensation.** MGB gross compensation may include marketing compensation to certain Company employees licensed as agents as agreed upon by the Company and MGB. In no event however shall Company employees be compensated by commission on policies issued by Company.

**C. MGB'S DUTIES.**

1. **Licenses and Approvals.** MGB shall obtain and maintain and provide copies of all necessary licenses and regulatory approvals to perform the services under this Agreement. The MGB shall oversee the licensing process and determine that all recruited Brokers are properly licensed and appointed. The Company shall assist MGB and perform administrative duties as required.

2. **Recruit, Instruct, Supervise, Operate.** MGB may recruit Brokers, and shall instruct and supervise such recruits in the marketing of Products. The MGB will adequately train each new recruit making sure that the recruit has an adequate working knowledge of self insurance, stop loss and excess loss plans as they relate to their marketing efforts of the ECHP.

3. **Business Development.** MGB shall advance, protect and conduct its business in the best interests of the Company as a fiduciary, such duties to include but not limited to facilitating agreements, contracts, and treaties with appropriate parties with the Programs, primary or fronting insurance companies, and reinsurance or excess loss insurance companies in a manner that will promote the business interests of the Company.

The MGB shall also have the following operational responsibilities:

a) To solicit applications for Insurance both directly and through recruited Brokers and upon completion of applications, make known to the company not only the information contained in the applications, but all information that may be discussed with the prospect or recruit concerning any area that may have an affect on the underwriting or the insurability of any potential participant.

b) To make the following information known to employer prospects when presenting reinsurance / stop loss products and / or the Employer's Choice Health Plan (ECHP), 1) the ECHP is a self insured plan that requires the employer to retain the risk associated with the benefit offered; 2) the employer may purchase reinsurance / stop loss coverage

2

from Pan American Life or other reinsurers approved by the Company to cover the part of the risk that is not desired; 3) reinsurance / stop loss covers the self insured plan for expenses beyond the employer retention and does not cover individual participants; 4) secondary reinsurers provide reinsurance for a primary reinsurer and do not provide reinsurance for the Plan or participants.

c)   Upon issuance of program material, to personally deliver or cause the appointed Broker to deliver and explain in detail the administration kit, certificates and all accompanying materials to the insured group.

d)   To accept initial payments with applications and forward the premium and applications to the Company in compliance with provision C.9 herein.

e)   To personally deliver to the group or cause the Broker to personally deliver any renewal offer made by the company and try to place that offer on a best efforts basis and to not show any products that would compete with the renewal offered during that same renewal offer meeting.

f)   Upon pending renewal, advise the company of any competing proposals the broker is aware of and advise the company of any information that may adversely affect the company's ability to affect the renewal.

g)   To personally or cause the Broker to visit each group client to answer questions and provide any other service work on an as needed basis.

h)   To perform any other duty when specifically requested in writing by an officer of the Company.

i)   To perform its business and oversee its Brokers in compliance with all regulations and laws including but not limited to Employer self insured plans.

4.   **Solicitation.** MGB shall help its Broker Agents in all aspects of soliciting Products. If MGB is contracting as an individual, then MGB may solicit applications for Products.

5.   **Service.** MGB shall help its Broker Agents in all aspects of servicing customers. If MGB is contracting as an individual, MGB shall provide service to MGB's customers.

6.   **Confidentiality and Privacy.** MGB shall comply with the "Confidentiality and Privacy Amendment" which is attached hereto and incorporated into this Agreement as Schedule C. Company may unilaterally revise the Confidentiality and Privacy Amendment upon written notice to MGB.

3

7. **Compliance with Law and Conduct.** MGB and its employees shall comply with all applicable laws and regulations and act in an ethical, professional manner in connection with this Agreement, including, without limitation, with respect to any compensation disclosure obligations and any other obligations it may have governing its relationships with its clients.

8. **Compliance with Company Policies.** MGB shall comply, and shall ensure that its employees and Broker Agents comply, with all policies, practices, procedures, processes and rules of Company. MGB shall promptly notify Company if MGB or any of its Broker Agents are not in compliance with any Company policy, practice, procedure or rule.

9. **Insurance.** MGB shall have and maintain Errors and Omissions liability insurance in an amount not less than One Million Dollars, ($1,000,000) covering MGB and MGB company employees during the term of this Agreement in an amount and nature, and with such carrier(s) satisfactory to Company and provide evidence of such insurance to Company upon request.

10. **Fiduciary Responsibilities.** MGB shall be responsible for all money collected by MGB, MGB's employees and its Broker Agents on behalf of Company and shall remit to Company all payments and collections received for or payable to Company from Broker Agents, applicants, customers, or other; no later than 5 days after receipt, or within any shorter period required by law. All money tendered as payment shall always be the property of Company and shall be held by MGB purely in a fiduciary capacity and not for MGB's own benefit. MGB is not authorized to spend, cash or deposit for any purpose any portion of such money.

11. **Records.** Except as provided in the Confidentiality and Privacy Statement, MGB shall keep regular and accurate records of all transactions related to this Agreement for a period of at least five years from the date of such transactions, or longer if required by federal or state law or regulation.

12. **Advertising Materials.** MGB shall obtain Company's written approval prior to using any advertising material or script identifying Company or Products, except such material provided by Company and used pursuant to Company's instructions.

13. **Notice of Litigation or Regulator Proceeding.** MGB shall promptly notify Company upon receiving notice of potential, threatened, or actual litigation or any regulatory inquiry or complaint with respect to this Agreement or any Product. Company shall have final decision-making authority to assume the administration and defense of any such action. A copy of the correspondence or document received shall accompany each notice.

D.   **LIMITATIONS.** MGB, either directly or through its employees or Broker Agents, shall not;

1.   **Expense or Liability.** Incur any expense or liability on account of, or otherwise bind Company without specific prior written approval from an Authorized Representative.

4

2.  **Alteration.** Alter any advertising materials or make, alter, waive or discharge any contracts or Products on behalf of Company.

3.  **Premium Payments and Reinstatement.** Extend the time for payment of any premium or waive any premium, or bind Company to reinstate any terminated contract, or accept payment in any form other than a customer check or money order payable to the Company or other method authorized by Company.

4.  **Respond in Connection with Proceeding.** Institute or file a response to any litigation or regulatory proceeding on behalf of Company in connection with any matter pertaining to this Agreement or any Product, without Company's prior written consent.

5.  **Replacement.** Replace any existing insurance product unless the replacement is in compliance with all applicable laws and regulations and is in the best interest of the customer. The decision whether to replace an insurance product should be made by the customer. To help the customer make a decision regarding any proposed replacement, MGB must provide the customer with full written disclosure (both positive and negative) of all relevant information.

6.  **Misrepresentation.** Misrepresent or induce any Broker Agent to misrepresent, any provision, benefit, or premium of any Product.

E.  **COMPENSATION ADMINISTRATION.**

1.  **Accounting.** Company will account to MGB for compensation based upon initial and renewal premiums, administrative fees and program fees received, and accepted by Company for policies issued upon applications submitted by or through MGB. Company reserves the right to freeze MGB's account for a reasonable period of time to ensure that funds are available to reimburse the Company for any Indebtedness.

2.  **Effect of Return of Premium and Fees.** If any premiums or revenue shall be returned by Company on any policy or contract, or should Company become liable for the return thereof for any cause either before or after the Termination Date, MGB shall pay to Company all compensation previously paid or credited to MGB's account on such returned premium or revenue.

3.  **Set-off.** Company is authorized to set-off and apply any and all amounts due to MGB from Company under this Agreement to any and all obligations or Indebtedness of MGB or its employees, Broker Agents or affiliates to Company or its affiliates. This right of set-off does not require company to make any prior demand upon MGB, and the right exists irrespective of whether the obligations of MGB or its affiliates are contingent or unmatured. The rights of the Company under this Section E.3 are in addition to any other rights and remedies which the Company may have under this Agreement or otherwise.

5

4.   **Interest.** Interest will accrue on any amount due under this Agreement, which has not been paid within thirty days of receipt of written demand for such amount at the rate of one percent per month, or the highest rate permitted by law, whichever is lower.

5.   **Limitation of Compensation Actions.**   Any claim by MGB regarding compensation must be brought within one year from the date the compensation was reported on an accounting issued from Company to MGB.   Any claim regarding compensation must be brought against the entity, which issued the Compensation and Product Schedule to which the claim relates.

F.   **TERMINATION WITH OR WITHOUT CAUSE.** In addition to any other termination provisions set forth, MGB or Company shall have the right at any time to terminate this Agreement, with cause or without cause, upon Thirty (30) days written notice to the other party.

Company shall have the immediate right of Termination upon written notice if one or more of the following events occur: 1) the Company loses the privilege of using the issuing carrier and is unable to find another suitable issuer for the ECHP; 2) the Company loses licensure or for any other regulatory reason loses the ability to handle the ECHP; 3) if the Company becomes bankrupt; 4) MGB loses licensure or for any other regulatory reason loses the ability to handle the ECHP; 5) if MGB becomes bankrupt; 6) if MGB at any time upon notice for cause, such as but not limited to fraud, misconduct, or failure of the MGB to comply with the terms of this Agreement, or if the MGB withholds money or documents belonging to the Company for which the Company has made demand; 7) on the effective date of sale, transfer or merger of the MGB's business or otherwise provided, however, the Company may offer an Agreement to any successor who meets the Company's requirements; 8) if any significant change in principals of the MGB occurs, unless approved in writing by the Company and/or the successor meets the Company's requirements. Termination shall be effective as later of the date of the event noted or the termination date. Termination will only affect new business compensation and not business produced prior to the termination date except for fraud or legal misconduct as noted in 6 herein and elsewhere.

G.   **INDEPENDENT CONTRACTOR.** MGB is an independent contractor in relationship to this agreement and not an employee of Company.   Subject to legal and regulatory requirements, MGB shall be free to exercise MGB's own judgment as to the persons from whom MGB will solicit and the time and place of such solicitation as well as the manner and operation of activities within this agreement.

H.   **INSPECTION OF BOOKS AND RECORDS.** Company shall have the right during normal business hours and with reasonable notice, to inspect, audit and make copies from the books and records of the MGB for the purpose of verifying MGB's compliance with the provisions of this Agreement.

I.   **INDEMNITY AND HOLD HARMLESS.** Each party shall indemnify and hold the other party harmless from any liability, loss, costs, expenses (including reasonable attorneys' fees incurred by the indemnified party) or damages, including punitive and extra-

6

contractual damages, resulting from any act or omission by the indemnifying party or any of its employees or Brokers in the performance of its duties under this Agreement or other agreements with Company, including, without limitation, any breach of its obligations provided in this Agreement.

**J.   GENERAL.**

1.   **Issue and Product Type.**  Company shall retain the right to decide whether to issue or withdraw its participation with ECHP or a Product, to establish a minimum rate for the product and determine the type of Product to be issued or withdrawn. Company may discontinue or change ECHP or a Product at any time.

2.   **Producer of Record.**  The producer of record for any product shall be determined by Company records.  Company reserves the right to change the producer of record according to Company procedures and shall have no obligation to designate a successor producer of record.

3.   **Notice.**  Any notice required or permitted to be sent to Company or MGB under this Agreement shall be delivered personally or sent by U.S. Mail with all postage prepaid or by express mail to the following address or such other address provided by Company:   Universal Fidelity Ins. Co.; 14920 Hertz Quail Springs Parkway, Oklahoma City, OK, 73134 or to MGB: Benefit America, LLC; 10 Corporate Hill Drive, Suite 330, Little Rock, AR 72205.

4.   **Entire Agreement.**  This Agreement, the Confidentiality and Privacy Amendment and the Compensation and Product Schedules constitute the entire agreement between the parties regarding the Products sold under this Agreement.

5.   **Governing Law.**  This Agreement shall be governed by the laws of the State of Oklahoma.

6.   **Arbitration.**   As a condition precedent to any right of action hereunder, it is agreed that in the event of any dispute or difference hereunder arising with reference to any transaction under this Agreement, whether arising before or after termination of this Agreement, the same shall be referred to two Arbitrators, one picked by the Company, the other by MGB.  If either MGB or Company fails to designate to the other an Arbitrator after 30 days notice by the other party, then the party having chosen an Arbitrator shall pick the second Arbitrator.  The Arbitrators shall pick a third Arbitrator and abide by the procedures of the American Arbitration Association and their written decision or that of the majority of them shall be final and binding on the contracting parties without appeal.  Any such arbitration shall take place in the State of Oklahoma unless otherwise agreed.  The entire expense shall be equally divided between the MGB and the Company.  This provision shall not be a subject of arbitration.

7.   **Severability.**  In the event any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions shall remain in effect.

8.   **No Waiver.** Failure of Company to enforce any provision of this Agreement shall not operate to waive or modify such provision or render such provision unenforceable.

9.   **No Assignment or Change.** Except for Compensation/Product Schedules, Confidentiality and Privacy Amendments and other amendments to the Agreement, which are required by federal, state or local laws or regulations, no modification, amendment or assignment of this Agreement shall be valid unless approved by mutual agreement. Compensation/Product Schedules, Confidentiality and Privacy Amendments and other amendments to the Agreement which are required by federal, state or local laws or regulations may be distributed only by Company but need not be signed by either party to be effective.

10.  **Survival.** MGB's appointment pursuant to this Agreement shall immediately terminate on the Termination Date. Except for Sections C.2 and C.3 of this Agreement, all other provision of this Agreement shall survive its termination.

11.  **Beneficiary.** If MGB is an individual, then MGB designates the beneficiary specified on the signature page or such other party or parties as MGB may designate by written notice delivered to and recorded by Company, as beneficiary for payment of any compensation becoming due after MGB's death.

12.  **Headings.** Any section or other heading contained in this Agreement are for reference purposes and convenience only and shall not affect, in any way, the meaning and interpretation of this Agreement.

13.  **Implementation.** Payments under this Agreement are contingent upon and subject to the successful execution of Third Party Administration Agreements and other agreements as necessary to the Company's satisfaction to implement the ECHP and other Programs with employer groups, insurance carriers and other contracts as required by the Company to obtain the benefits of marketing the Programs.

14.  **Client Termination.** The Company reserves the right to terminate any individual client participating in ECHP in accordance with contracts in effect at any time. In the event of such action, the Company shall notify the MGB of the termination.

15.  **MGB Performance.** MGB agrees that fraud, malfeasance, misappropriation, withholding of funds by MGB, MGB's willful neglect of any duty or obligation required by this Agreement, non-delivery of product and/or certificates, the retention of any property of the Company after demand is made by the Company or its authorized representative, or failure to service employer accounts shall result in forfeiture of any and all service fees of every kind that may be due to the MGB under this Agreement.

16.  **Additional Agreements.** Each Party shall execute, acknowledge and deliver such additional documents, writings or assurances as the other may periodically require so as giving full force and effect to the terms and provisions of the Agreement.

17    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute but one and the same Instrument

K.    DEFINITIONS.  The following terms have the following meanings.  Any singular word shall include any plural of the same word

1.    "Authorized Representative" means the President of a Company or an individual authorized in writing by the President

2.    "Compensation and Product Schedule" means a Company's distributed commission and compensation schedule that (a) specifies the amounts and conditions under which commissions and compensation will be due and payable to MGB for any Product, and (b) is made a part of this Agreement.

3.    "General Broker and Broker" means any individual or organization, which (a) enters into a general broker or broker or other marketing agreement with the MGB and (b) submits Product applications that designate the MGB as the recruiting source and (C) is properly licensed and appointed

4.    "Indebtedness" means any amounts owed by MGB to Company, including but not limited to (a) the chargeback of any compensation paid or credited to MGB under this or any other Agreement, if the monies on which such compensation was based are not collected or are refunded by the Company (b) any advances made by Company to MGB, (c) any expenses incurred by the Company on behalf of MGB, and (d) any amount paid by the Company, which in its determination resulted from fraud, misrepresentation or other improper conduct by the MGB

5.    "Product" means any insurance policy, contract, investment vehicle or other offering identified in any Compensation and Product Schedule.

6.    "Termination Date" means the later to occur of (a) the date on which MGB or Company sends written notice of termination to the other party or (b) the date specified by MGB or Company in a written notice of termination to the other party

7.    "Vested Compensation" means compensation identified as vested on a Compensation/Product Schedule and that may be paid to MGB after the Termination Date if (a) the policy related to the Product remains in force, (b) the premiums and program charges for the policy are paid to the Company, and (c) if MGB is the override agents or writing agent. MGB or MGB's recruited agent must also remain the producer of record

EXECUTION:
IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below.

On Behalf of:                                          On Behalf of:
BENEFIT AMERICA, LLC                          UNIVERSAL FIDELITY LIFE INSURANCE CO. INC

_____ J matt RdC at 7-1-09          _____ 7/1/09
Member                        Date                  Company Officer                     Date

9

Schedule A
Compensation and Product Schedule

Geographic Area                    United States where Products are approved and allowed by regulatory
                                   authorities and subject to Company written approval by State.

Compensation will be paid as follows

ECHP Program. Up to 12 % of Administrative Fees and other contracted Employer charges, paid on
collected fees 20 days after month's end for which they were earned net of any refunded fees

Dental & Vision: Up to 15% of Premium as defined in Company Administrative Contracts with Insurer.
Commission paid pursuant to the terms of the Insurer contract with Company.

Group Term Life: Up to 12% of Premium as defined in Company Administrative Contracts with
Insurer. Commission paid pursuant to the terms of the Insurer contract with Company.

MGB and Company hereby acknowledge that MGB intends to and shall pay Legend Insurance Agency
LLC a commission of 20% of the net retained MGB compensation on non-Company policies after
payments to sub-brokers of the compensation payout for the ECHP Program. MGB shall execute such
Agreements as needed to implement this clause

Compensation levels may be changed by group or by recruited subordinate broker subject to mutual
agreement between the Company and the MGB.

Vested Compensation   Compensation on all cases sold prior to a termination of the agreement will be
fully vested until the case's non-renewal subject to all other terms and conditions of this Agreement.


EXECUTION:

IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below

On Behalf of:                                    On Behalf of:
BENEFIT AMERICA, LLC                             UNIVERSAL FIDELITY LIFE INSURANCE CO, INC

Member                    Date                   Company Officer          Date

10

Schedule B
Administrative Business Development Schedule

Effective Date of the Agreement and Addendum is July 1, 2009

Program:  Employers Choice Health Plans, MedRx, American Denticare and Employers Choice Health Alliance and other single employer self insured plans (collectively the "Programs")

Geographic Area:  United States where Programs are approved and allowed by regulatory agencies, subject to Company approval.

Compensation Levels, Terms and Conditions:

The Master General Broker will receive a percentage of the Administrative Operating Profit ("OP") derived from the Programs described herein produced according to the following

1.  OP is defined as Fee and Commission Income derived from the Programs less expense incurred as a result of the Programs. Expenses shall include those incurred to sustain an office and employees in Little Rock, Arkansas and those expenses incurred by Company in administering and selling the Programs and Products including commission on fees and premiums as described in Schedule A of this Agreement.

2   As compensation for fees produced for the Company, MGB earnings will be 75% of the OP for thirty six (36) months from the date of this Agreement and will then decrease to 50% of OP in perpetuity. On the 20th of each month a calculation shall occur for the previous month and the balance due to the MGB will be paid by the 30th day of the month. If the cumulative OP profit from Program inception is negative or a loss then no payment will be made until the total cumulative OP is greater than zero or profitable

3   A budget of expenses described in item 1 will be developed by the Parties and mutually agreed to in writing. Changes to the budget must be mutually agreed to in writing by the Parties. If there is no agreement then the MGB and Company agree to arbitrate pursuant to the Master General Broker Agreement of which this Schedule B is a part.

4.  Company shall prepare monthly financial statements for the Programs no later than 20 days of month end. Each Party shall have 50 days from month's end to dispute or question the accounting. After the 50 days without challenge, the accounting becomes final and agreed to by each respective Party

5.  Incidental use of employees and resources from Company or from Program budgeted resources shall not be accounted for as a due to or from the Program until such time as they are readily ascertainable, not nominal in amount and/or are expected to be ongoing

6.  Payments under this Agreement are contingent upon and subject to the successful execution of Third Party Administrative agreements and other agreements as necessary to the Company's satisfaction to implement the Programs with employer groups, insurance carriers and other contracts as required by the Company to obtain the benefits of marketing the Programs

7   Any other business opportunities the Parties may decide to pursue together shall be subject to a separate agreement with terms and conditions related to the particular situation
    IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below.

On Behalf of:                                          On Behalf of
BENEFIT AMERICA, LLC                              UNIVERSAL FIDELITY LIFE INSURANCE CO, INC

_J. Matt Rue_ AT 7-1-09                           _____ chm 7/1/09
Member                       Date                Company Officer            Date

11

Schedule C
Confidentially and Privacy Agreement
Business Associates Agreement

This Business Associate Addendum (this "Addendum") between Universal Fidelity Life Insurance Company ("Covered Entity") and Benefit America, LLC ("Business Associate") is dated and effective as of July 1, 2009.

WHEREAS, COVERED ENTITY is disclosing and/or making available certain data, which may include Protected Health Information as that term is defined in 45 C.F.R. §164.301 ("PHI"), to BUSINESS ASSOCIATE to perform tasks on behalf of, and under the instructions of, COVERED ENTITY:

WHEREAS, COVERED ENTITY is or may be subject to the requirements of 42 U.S.C. 1171 et seq, enacted by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and regulations promulgated thereunder (65 Fed. Reg. 82462, et seq., December 20, 2000, as modified by 67 Fed. Reg. 53183, August 14, 2002 (the "Privacy Rule"), and 63 Fed. Reg. 43242, August 12, 1998, as modified by 68 Fed. Reg. 8334, February 20, 2003 (the "Security Rule")).

NOW, THEREFORE, the parties agree as follows (terms used but not otherwise defined in this Addendum shall have the meanings assigned such terms as in the Privacy Rule):

BUSINESS ASSOCIATE may use and disclose PHI only as required to satisfy its obligations under the Master General Broker Agreement dated July 1, 2009, as permitted herein, or as required by law. BUSINESS ASSOCIATE shall not use or disclose PHI received from COVERED ENTITY in any manner that would constitute a violation of the Privacy Regulations if done by COVERED ENTITY.

BUSINESS ASSOCIATE agrees to take reasonable precautions to protect the PHI from loss, misuse and unauthorized access, disclosure, alteration and destruction.

BUSINESS ASSOCIATE shall, within thirty (30) days of becoming aware of any use or disclosure of PHI in violation of this Addendum, report any such use disclosure to COVERED ENTITY.

BUSINESS ASSOCIATE shall obtain and maintain an agreement with each agent or subcontractor that has or will have access to the PHI, which is received from, or created or received by BUSINESS ASSOCIATE on behalf of COVERED ENTITY, pursuant to which agreement such agent or subcontractor agrees to be bound by the same restrictions, terms and conditions that apply to BUSINESS ASSOCIATE pursuant to this Agreement with respect to such PHI.

Within twenty (20) days of notice by COVERED ENTITY to BUSINESS ASSOCIATE that COVERED ENTITY has received a request for an accounting of disclosures of PHI, other than related to the treatment of the patient, the processing of payments related to such treatment, or the operation of a covered entity or its business associate and not relating to disclosures made earlier than six (6) years prior to the date on which the accounting was requested, BUSINESS ASSOCIATE shall make available to COVERED ENTITY such information as is in BUSINESS ASSOCIATE's possession and is required for COVERED ENTITY to make the accounting required by 45 C.F.R. §164.528. In the event the request for an accounting is delivered directly to BUSINESS ASSOCIATE, BUSINESS ASSOCIATE shall within ten (10) days forward such request to COVERED ENTITY.

At COVERED ENTITY's request, BUSINESS ASSOCIATE shall make its internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by BUSINESS ASSOCIATE on behalf of, COVERED ENTITY available to the Secretary of the Department of Health and Human Services for purposes of determining COVERED ENTITY's compliance with the Privacy Regulations.

Unless otherwise limited herein, BUSINESS ASSOCIATE may: use the PHI in its possession for its proper management and administration and to fulfill any present or future legal responsibilities of BUSINESS ASSOCIATE, disclose PHI for the proper management and administration of the BUSINESS ASSOCIATE, provided that disclosures are required by law, or BUSINESS ASSOCIATE obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the BUSINESS ASSOCIATE of any instances of which it is aware in which the confidentiality of the information has been breached, use Protected Health Information to report violations of law to

appropriate Federal and State authorities, consistent with § 164.502(j)(1), aggregate the PHI in its possession with the PHI of other Covered Entities that BUSINESS ASSOCIATE has in its possession through its capacity as a Business Associate to the other Covered Entities, provided that the purpose of such aggregation is to provide COVERED ENTITY with data analysis relating to the Health Care Operations of COVERED ENTITY; de-identify any and all PHI provided that the de-identification conforms to the requirements of 45 C.F.R. § 164.514(b)

If BUSINESS ASSOCIATE conducts standard transactions (as defined in 45 C.F.R. Part 160) for or on behalf of COVERED ENTITY, BUSINESS ASSOCIATE will comply and will require by written contract each agent or contractor (including any subcontractor) involved with the conduct of such standard transactions to comply, with each applicable requirement of the Transaction Regulations (as set forth at 45 C.F.R. Parts 160 and 162). BUSINESS ASSOCIATE will not enter into, or permit its agents or contractors (including subcontractors) to enter into, any trading partner agreement in connection with the conduct of standard transactions for or on behalf of COVERED ENTITY that: (i) changes the definition, data condition, or use of a data element or segment in a standard transaction; (ii) adds any data elements or segments to the maximum defined data set; (iii) uses any code or data element that is marked "not used" in the standard transaction's implementation specification or is not in the standard transaction's implementation specification; or (iv) changes the meaning or intent of the standard transaction's implementation specification. BUSINESS ASSOCIATE agrees to participate in any test modification conducted by COVERED ENTITY in accordance with the Transaction Regulations

BUSINESS ASSOCIATE agrees to implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that it creates, receives, maintains or transmits to or on behalf of COVERED ENTITY as required by the Security Regulations as set forth at 45 C.F.R. Parts 160 and 164, subpart C. BUSINESS ASSOCIATE specifically agrees to employ multiple security mechanisms to ensure the confidentiality, integrity and availability of the electronic data which is exchanged with COVERED ENTITY, including but not limited to authentication controls, authorization controls, audit controls and encryption, as requested by COVERED ENTITY. BUSINESS ASSOCIATE further agrees to ensure that any agent, including a subcontractor, to whom it provides such information, agrees to implement reasonable and appropriate safeguards to protect it. BUSINESS ASSOCIATE agrees to promptly report to COVERED ENTITY any security incident of which it becomes aware

In the event that COVERED ENTITY determines that BUSINESS ASSOCIATE has materially breached the terms of this Addendum, COVERED ENTITY shall provide notice to BUSINESS ASSOCIATE of such material breach, and shall provide BUSINESS ASSOCIATE with a reasonable time to cure such breach, which shall not be less than thirty (30) days. In the event that the breach is not cured within the specified period, COVERED ENTITY may terminate this Addendum

Upon termination of this Agreement, BUSINESS ASSOCIATE shall either return or destroy all PHI received from COVERED ENTITY or created or received by BUSINESS ASSOCIATE on behalf of COVERED ENTITY and which BUSINESS ASSOCIATE still maintains in any form. BUSINESS ASSOCIATE shall not retain any copies of such PHI. Notwithstanding the foregoing, to the extent that it is not feasible to return or destroy such PHI, the terms and provisions of this Agreement shall survive termination of this Agreement and such PHI shall be used or disclosed solely for such purpose or purposes which prevented the return or destruction of such PHI.

Compliance with the terms of this Agreement is a material term of any and all underlying agreements pursuant to which COVERED ENTITY is making available the PHI to BUSINESS ASSOCIATE and COVERED ENTITY. The parties understand and agree that termination of this Addendum shall constitute a default by BUSINESS ASSOCIATE under any and all such underlying agreements, and shall give rise to COVERED ENTITY's immediate right to terminate such underlying agreements.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum as of the day and year first written above

Business Associate                                          Covered Entity

On Behalf of:                                               On Behalf of:
BENEFIT AMERICA, LLC                                        UNIVERSAL FIDELITY LIFE INSURANCE CO. INC.

_C. Matt R.C. III 7-1-09_                                   _RM Chm 7/1/09_
Member                    Date                              Company Officer                 Date

13

ELECTRONICALLY FILED
2014-Jul-24 16:00:32
60CV-14-2479
C06D05 : 13 Pages

### Master General Broker Agreement

This Agreement is made this 1st day of July, 2009 by and between Universal Fidelity Life Insurance Co. located at 149208 Hertz Quail Springs Parkway, Oklahoma City, OK 73134, an Oklahoma Corporation hereinafter designated as "Company" and Benefit America, LLC, an Arkansas Limited Liability Company with principal business at 10 Corporate Hill Drive, Suite 330, Little Rock, AR 72205 hereinafter designated as "Master General Broker or MGB." This agreement pertains exclusively to products administered by the Company and known as the Employers Choice Health Plan hereafter designated as "ECHP" and related life, dental, and vision insurance.

The Parties agree as follows:

A.    **ENGAGEMENT.** The Company hereby exclusively contracts with the MGB to solicit both directly and through General Brokers and Brokers, administrative agreements for the ECHP group programs and pursuant to Company's administrative agreements, with Pan American Life Insurance Company and other insurance companies, applications designated "Insurance, Reinsurance, Stop Loss, or Excess Loss coverage", which also includes sales to Employers participating in the ECHP program of life, dental, and vision programs in geographical areas designated in the attached Compensation and Product Schedule.

B.    **COMPENSATION.**

    1.    **For Each Product.** MGB's compensation depends on the particular Products sold. Compensation for each Product will be as specified in compensation and product Schedules A and B attached and subject to administrative agreements with Pan American Life Insurance Company which defines available commissions for Producers. Compensation and Product Schedules for new business may be changed by mutual agreement of Company and the MGB. MGB may pay a portion of the compensation to a subordinate recruited Broker. MGB's compensation will be reduced by the amount of compensation paid to any subordinate Broker and Company if any.

    2.    **Contingencies.** In addition to any conditions imposed in the Compensation and Product Schedules and any amendments, no compensation is earned until:

        (a) MGB is licensed, in good standing under State laws as a legal entity and appointed in accordance with laws and Company procedures,

        (b) The Product is actually issued, delivered to and accepted by the customer, and

        (c) The premium and or program charge for the Product is paid to the Company and considered earned, "as earned basis".

    3.    **Compensation After Termination.** MGB shall not be entitled to any compensation after the Termination Date of this Agreement, except for:

        (a) Vested Compensation, and

1

EXHIBIT

2

(b) Any net credit balance after offset of any debit items in MGB's account for compensation earned as of the Termination Date.

4.   **Recruited Broker Compensation.** The Company and the MGB agree to not issue contracts with retail brokers for more than 6% commission. The Company will facilitate payments to MGB recruited brokers through the Company administration system.

5.   **Company Marketing Employee Compensation.** MGB gross compensation may include marketing compensation to certain Company employees licensed as agents as agreed upon by the Company and MGB. In no event however shall Company employees be compensated by commission on policies issued by Company.

C.   **MGB'S DUTIES.**

1.   **Licenses and Approvals.** MGB shall obtain and maintain and provide copies of all necessary licenses and regulatory approvals to perform the services under this Agreement. The MGB shall oversee the licensing process and determine that all recruited Brokers are properly licensed and appointed. The Company shall assist MGB and perform administrative duties as required.

2.   **Recruit, Instruct, Supervise, Operate.** MGB may recruit Brokers, and shall instruct and supervise such recruits in the marketing of Products. The MGB will adequately train each new recruit making sure that the recruit has an adequate working knowledge of self insurance, stop loss and excess loss plans as they relate to their marketing efforts of the ECHP.

3.   **Business Development.** MGB shall advance, protect and conduct its business in the best interests of the Company as a fiduciary, such duties to include but not limited to facilitating agreements, contracts, and treaties with appropriate parties with the Programs, primary or fronting insurance companies, and reinsurance or excess loss insurance companies in a manner that will promote the business interests of the Company.

The MGB shall also have the following operational responsibilities:

a)   To solicit applications for Insurance both directly and through recruited Brokers and upon completion of applications, make known to the company not only the information contained in the applications, but all information that may be discussed with the prospect or recruit concerning any area that may have an affect on the underwriting or the insurability of any potential participant.

b)   To make the following information known to employer prospects when presenting reinsurance / stop loss products and / or the Employers Choice Health Plan (ECHP), 1) the ECHP is a self insured plan that requires the employer to retain the risk associated with the benefit offered; 2) the employer may purchase reinsurance / stop loss coverage

2

from Pan American Life or other reinsurers approved by the Company to cover the part of the risk that is not desired; 3) reinsurance / stop loss covers the self insured plan for expenses beyond the employer retention and does not cover individual participants; 4) secondary reinsurers provide reinsurance for a primary reinsurer and do not provide reinsurance for the Plan or participants.

c)     Upon issuance of program material, to personally deliver or cause the appointed Broker to deliver and explain in detail the administration kit, certificates and all accompanying materials to the insured group.

d)     To accept initial payments with applications and forward the premium and applications to the Company in compliance with provision C.9 herein.

e)     To personally deliver to the group or cause the Broker to personally deliver any renewal offer made by the company and try to place that offer on a best efforts basis and to not show any products that would compete with the renewal offered during that same renewal offer meeting.

f)     Upon pending renewal, advise the company of any competing proposals the broker is aware of and advise the company of any information that may adversely affect the company's ability to affect the renewal.

g)     To personally or cause the Broker to visit each group client to answer questions and provide any other service work on an as needed basis.

h)     To perform any other duty when specifically requested in writing by an officer of the Company.

i)     To perform its business and oversee its Brokers in compliance with all regulations and laws including but not limited to Employer self insured plans.

4.     **Solicitation.** MGB shall help its Broker Agents in all aspects of soliciting Products. If MGB is contracting as an individual, then MGB may solicit applications for Products.

5.     **Service.** MGB shall help its Broker Agents in all aspects of servicing customers. If MGB is contracting as an individual, MGB shall provide service to MGB's customers.

6.     **Confidentiality and Privacy.** MGB shall comply with the "Confidentiality and Privacy Amendment" which is attached hereto and incorporated into this Agreement as Schedule C. Company may unilaterally revise the Confidentiality and Privacy Amendment upon written notice to MGB.

7. **Compliance with Law and Conduct.** MGB and its employees shall comply with all applicable laws and regulations and act in an ethical, professional manner in connection with this Agreement, including, without limitation, with respect to any compensation disclosure obligations and any other obligations it may have governing its relationships with its clients.

8. **Compliance with Company Policies.** MGB shall comply, and shall ensure that its employees and Broker Agents comply, with all policies, practices, procedures, processes and rules of Company. MGB shall promptly notify Company if MGB or any of its Broker Agents are not in compliance with any Company policy, practice, procedure or rule.

9. **Insurance.** MGB shall have and maintain Errors and Omissions liability insurance in an amount not less than One Million Dollars, ($1,000,000) covering MGB and MGB company employees during the term of this Agreement in an amount and nature, and with such carrier(s) satisfactory to Company and provide evidence of such insurance to Company upon request.

10. **Fiduciary Responsibilities.** MGB shall be responsible for all money collected by MGB, MGB's employees and its Broker Agents on behalf of Company and shall remit to Company all payments and collections received for or payable to Company from Broker Agents, applicants, customers, or other; no later than 5 days after receipt, or within any shorter period required by law. All money tendered as payment shall always be the property of Company and shall be held by MGB purely in a fiduciary capacity and not for MGB's own benefit. MGB is not authorized to spend, cash or deposit for any purpose any portion of such money.

11. **Records.** Except as provided in the Confidentiality and Privacy Statement, MGB shall keep regular and accurate records of all transactions related to this Agreement for a period of at least five years from the date of such transactions, or longer if required by federal or state law or regulation.

12. **Advertising Materials.** MGB shall obtain Company's written approval prior to using any advertising material or script identifying Company or Products, except such material provided by Company and used pursuant to Company's instructions.

13. **Notice of Litigation or Regulator Proceeding.** MGB shall promptly notify Company upon receiving notice of potential, threatened, or actual litigation or any regulatory inquiry or complaint with respect to this Agreement or any Product. Company shall have final decision-making authority to assume the administration and defense of any such action. A copy of the correspondence or document received shall accompany each notice.

D. **LIMITATIONS.** MGB, either directly or through its employees or Broker Agents, shall not;

1. **Expense or Liability.** Incur any expense or liability on account of, or otherwise bind Company without specific prior written approval from an Authorized Representative.

4

2.    **Alteration.** Alter any advertising materials or make, alter, waive or discharge any contracts or Products on behalf of Company.

3.    **Premium Payments and Reinstatement.** Extend the time for payment of any premium or waive any premium, or bind Company to reinstate any terminated contract, or accept payment in any form other than a customer check or money order payable to the Company or other method authorized by Company.

4.    **Respond in Connection with Proceeding.** Institute or file a response to any litigation or regulatory proceeding on behalf of Company in connection with any matter pertaining to this Agreement or any Product, without Company's prior written consent.

5.    **Replacement.** Replace any existing insurance product unless the replacement is in compliance with all applicable laws and regulations and is in the best interest of the customer. The decision whether to replace an insurance product should be made by the customer. To help the customer make a decision regarding any proposed replacement, MGB must provide the customer with full written disclosure (both positive and negative) of all relevant information.

6.    **Misrepresentation.** Misrepresent or induce any Broker Agent to misrepresent any provision, benefit, or premium of any Product.

E.    **COMPENSATION ADMINISTRATION.**

1.    **Accounting.** Company will account to MGB for compensation based upon initial and renewal premiums, administrative fees and program fees received, and accepted by Company for policies issued upon applications submitted by or through MGB. Company reserves the right to freeze MGB's account for a reasonable period of time to ensure that funds are available to reimburse the Company for any Indebtedness.

2.    **Effect of Return of Premium and Fees.** If any premiums or revenue shall be returned by Company on any policy or contract, or should Company become liable for the return thereof for any cause either before or after the Termination Date, MGB shall pay to Company all compensation previously paid or credited to MGB's account on such returned premium or revenue.

3.    **Set-off.** Company is authorized to set-off and apply any and all amounts due to MGB from Company under this Agreement to any and all obligations or Indebtedness of MGB or its employees, Broker Agents or affiliates to Company or its affiliates. This right of set-off does not require company to make any prior demand upon MGB, and the right exists irrespective of whether the obligations of MGB or its affiliates are contingent or unmatured. The rights of the Company under this Section E.3 are in addition to any other rights and remedies which the Company may have under this Agreement or otherwise.

4.     **Interest.** Interest will accrue on any amount due under this Agreement, which has not been paid within thirty days of receipt of written demand for such amount at the rate of one percent per month, or the highest rate permitted by law, whichever is lower.

5.     **Limitation of Compensation Actions.** Any claim by MGB regarding compensation must be brought within one year from the date the compensation was reported on an accounting issued from Company to MGB. Any claim regarding compensation must be brought against the entity, which issued the Compensation and Product Schedule to which the claim relates.

F.     **TERMINATION WITH OR WITHOUT CAUSE.** In addition to any other termination provisions set forth, MGB or Company shall have the right at any time to terminate this Agreement, with cause or without cause, upon Thirty (30) days written notice to the other party.

Company shall have the immediate right of Termination upon written notice if one or more of the following events occur: 1) the Company loses the privilege of using the issuing carrier and is unable to find another suitable issuer for the ECHP; 2) the Company loses licensure or for any other regulatory reason loses the ability to handle the ECHP; 3) if the Company becomes bankrupt; 4) MGB loses licensure or for any other regulatory reason loses the ability to handle the ECHP; 5) if MGB becomes bankrupt; 6) if MGB at any time upon notice for cause, such as but not limited to fraud, misconduct, or failure of the MGB to comply with the terms of this Agreement, or if the MGB withholds money or documents belonging to the Company for which the Company has made demand; 7) on the effective date of sale, transfer or merger of the MGB's business or otherwise provided, however, the Company may offer an Agreement to any successor who meets the Company's requirements; 8) if any significant change in principals of the MGB occurs, unless approved in writing by the Company and/or the successor meets the Company's requirements. Termination shall be effective as later of the date of the event noted or the termination date. Termination will only affect new business compensation and not business produced prior to the termination date except for fraud or legal misconduct as noted in 6 herein and elsewhere.

G.     **INDEPENDENT CONTRACTOR.** MGB is an independent contractor in relationship to this agreement and not an employee of Company. Subject to legal and regulatory requirements, MGB shall be free to exercise MGB's own judgment as to the persons from whom MGB will solicit and the time and place of such solicitation as well as the manner and operation of activities within this agreement.

H.     **INSPECTION OF BOOKS AND RECORDS.** Company shall have the right during normal business hours and with reasonable notice, to inspect, audit and make copies from the books and records of the MGB for the purpose of verifying MGB's compliance with the provisions of this Agreement.

I.     **INDEMNITY AND HOLD HARMLESS.** Each party shall indemnify and hold the other party harmless from any liability, loss, costs, expenses (including reasonable attorneys' fees incurred by the indemnified party) or damages, including punitive and extra-

6

contractual damages, resulting from any act or omission by the indemnifying party or any of its employees or Brokers in the performance of its duties under this Agreement or other agreements with Company, including, without limitation, any breach of its obligations provided in this Agreement.

J.  **GENERAL.**

1.  **Issue and Product Type.** Company shall retain the right to decide whether to issue or withdraw its participation with ECHP or a Product, to establish a minimum rate for the product and determine the type of Product to be issued or withdrawn. Company may discontinue or change ECHP or a Product at any time.

2.  **Producer of Record.** The producer of record for any product shall be determined by Company records. Company reserves the right to change the producer of record according to Company procedures and shall have no obligation to designate a successor producer of record.

3.  **Notice.** Any notice required or permitted to be sent to Company or MGB under this Agreement shall be delivered personally or sent by U.S. Mail with all postage prepaid or by express mail to the following address or such other address provided by Company:   Universal Fidelity Ins. Co.; 14920 Hertz Quail Springs Parkway, Oklahoma City, OK, 73134 or to MGB: Benefit America, LLC; 10 Corporate Hill Drive, Suite 330, Little Rock, AR 72205.

4.  **Entire Agreement.** This Agreement, the Confidentiality and Privacy Amendment and the Compensation and Product Schedules constitute the entire agreement between the parties regarding the Products sold under this Agreement.

5.  **Governing Law.** This Agreement shall be governed by the laws of the State of Oklahoma.

6.  **Arbitration.** As a condition precedent to any right of action hereunder, it is agreed that in the event of any dispute or difference hereunder arising with reference to any transaction under this Agreement, whether arising before or after termination of this Agreement, the same shall be referred to two Arbitrators, one picked by the Company, the other by MGB. If either MGB or Company fails to designate to the other an Arbitrator after 30 days notice by the other party, then the party having chosen an Arbitrator shall pick the second Arbitrator. The Arbitrators shall pick a third Arbitrator and abide by the procedures of the American Arbitration Association and their written decision or that of the majority of them shall be final and binding on the contracting parties without appeal. Any such arbitration shall take place in the State of Oklahoma unless otherwise agreed. The entire expense shall be equally divided between the MGB and the Company. This provision shall not be a subject of arbitration.

7.  **Severability.** In the event any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions shall remain in effect.

8.   **No Waiver.** Failure of Company to enforce any provision of this Agreement shall not operate to waive or modify such provision or render such provision unenforceable.

9.   **No Assignment or Change.** Except for Compensation/Product Schedules, Confidentiality and Privacy Amendments and other amendments to the Agreement, which are required by federal, state or local laws or regulations, no modification, amendment or assignment of this Agreement shall be valid unless approved by mutual agreement. Compensation/Product Schedules, Confidentiality and Privacy Amendments and other amendments to the Agreement which are required by federal, state or local laws or regulations may be distributed only by Company but need not be signed by either party to be effective.

10.  **Survival.** MGB's appointment pursuant to this Agreement shall immediately terminate on the Termination Date. Except for Sections C.2 and C.3 of this Agreement, all other provision of this Agreement shall survive its termination.

11.  **Beneficiary.** If MGB is an individual, then MGB designates the beneficiary specified on the signature page or such other party or parties as MGB may designate by written notice delivered to and recorded by Company, as beneficiary for payment of any compensation becoming due after MGB's death.

12.  **Headings.** Any section or other heading contained in this Agreement are for reference purposes and convenience only and shall not affect, in any way, the meaning and interpretation of this Agreement.

13.  **Implementation.** Payments under this Agreement are contingent upon and subject to the successful execution of Third Party Administration Agreements and other agreements as necessary to the Company's satisfaction to implement the ECHP and other Programs with employer groups, insurance carriers and other contracts as required by the Company to obtain the benefits of marketing the Programs.

14.  **Client Termination.** The Company reserves the right to terminate any individual client participating in ECHP in accordance with contracts in effect at any time. In the event of such action, the Company shall notify the MGB of the termination.

15.  **MGB Performance.** MGB agrees that fraud, malfeasance, misappropriation, withholding of funds by MGB, MGB's willful neglect of any duty or obligation required by this Agreement, non-delivery of product and/or certificates, the retention of any property of the Company after demand is made by the Company or its authorized representative, or failure to service employer accounts shall result in forfeiture of any and all service fees of every kind that may be due to the MGB under this Agreement.

16.  **Additional Agreements.** Each Party shall execute, acknowledge and deliver such additional documents, writings or assurances as the other may periodically require so as giving full force and effect to the terms and provisions of the Agreement.

17. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute but one and the same Instrument.

K. **DEFINITIONS.** The following terms have the following meanings. Any singular word shall include any plural of the same word.

1. **"Authorized Representative"** means the President of a Company or an individual authorized in writing by the President.

2. **"Compensation and Product Schedule"** means a Company's distributed commission and compensation schedule that (a) specifies the amounts and conditions under which commissions and compensation will be due and payable to MGB for any Product, and (b) is made a part of this Agreement.

3. **"General Broker and Broker"** means any individual or organization, which (a) enters into a general broker or broker or other marketing agreement with the MGB and (b) submits Product applications that designate the MGB as the recruiting source and (C) is properly licensed and appointed.

4. **"Indebtedness"** means any amounts owed by MGB to Company, including but not limited to (a) the chargeback of any compensation paid or credited to MGB under this or any other Agreement, if the monies on which such compensation was based are not collected or are refunded by the Company (b) any advances made by Company to MGB, (c) any expenses incurred by the Company on behalf of MGB, and (d) any amount paid by the Company, which in its determination resulted from fraud, misrepresentation or other improper conduct by the MGB.

5. **"Product"** means any insurance policy, contract, investment vehicle or other offering identified in any Compensation and Product Schedule.

6. **"Termination Date"** means the later to occur of (a) the date on which MGB or Company sends written notice of termination to the other party or (b) the date specified by MGB or Company in a written notice of termination to the other party.

7. **"Vested Compensation"** means compensation identified as vested on a Compensation/Product Schedule and that may be paid to MGB after the Termination Date if (a) the policy related to the Product remains in force, (b) the premiums and program charges for the policy are paid to the Company, and (c) if MGB is the override agents or writing agent, MGB or MGB's recruited agent must also remain the producer of record.

**EXECUTION:**
IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below.

On Behalf of:                                              On Behalf of:
BENEFIT AMERICA, LLC                          UNIVERSAL FIDELITY LIFE INSURANCE CO. INC.

_____ 3 Aug 09          _____
Member                        Date                     Company Officer              Date

*Authorizing Agent for*
*Benefit America, LLC*

9

## Schedule A
## Compensation and Product Schedule

Geographic Area:                United States where Products are approved and allowed by regulatory
                                authorities and subject to Company written approval by State.

Compensation will be paid as follows.

**ECHP Program:** Up to 12 % of Administrative Fees and other contracted Employer charges, paid on collected fees 20 days after month's end for which they were earned net of any refunded fees.

**Dental & Vision:** Up to 15% of Premium as defined in Company Administrative Contracts with Insurer. Commission paid pursuant to the terms of the Insurer contract with Company.

**Group Term Life:** Up to 12 % of Premium as defined in Company Administrative Contracts with Insurer. Commission paid pursuant to the terms of the Insurer contract with Company.

MGB and Company hereby acknowledge that MGB intends to and shall pay Legend Insurance Agency LLC a commission of 20% of the net retained MGB compensation on non-Company policies after payments to sub-brokers of the compensation payout for the ECHP Program. MGB shall execute such Agreements as needed to implement this clause.

Compensation levels may be changed by group or by recruited subordinate broker subject to mutual agreement between the Company and the MGB.

**Vested Compensation:** Compensation on all cases sold prior to a termination of the agreement will be fully vested until the case's non-renewal subject to all other terms and conditions of this Agreement.

## EXECUTION:

IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below.

On Behalf of:                           On Behalf of:
BENEFIT AMERICA, LLC                    UNIVERSAL FIDELITY LIFE INSURANCE CO. INC.


Member                      Date        Company Officer              Date

10

Schedule B
Administrative Business Development Schedule

**Effective Date of the Agreement and Addendum is July 1, 2009**

**Program:** Employers Choice Health Plans, MedRx, American Denticare and Employers Choice Health Alliance and other single employer self insured plans (collectively the "Programs")

**Geographic Area:** United States where Programs are approved and allowed by regulatory agencies, subject to Company approval.

**Compensation Levels, Terms and Conditions:**

The Master General Broker will receive a percentage of the Administrative Operating Profit ("OP") derived from the Programs described herein produced according to the following:

1. OP is defined as Fee and Commission Income derived from the Programs less expense incurred as a result of the Programs. Expenses shall include those incurred to sustain an office and employees in Little Rock, Arkansas and those expenses incurred by Company in administering and selling the Programs and Products including commission on fees and premiums as described in Schedule A of this Agreement.

2. As compensation for fees produced for the Company, MGB earnings will be 75% of the OP for thirty six (36) months from the date of this Agreement and will then decrease to 50% of OP in perpetuity. On the 20th of each month a calculation shall occur for the previous month and the balance due to the MGB will be paid by the 30th day of the month. If the cumulative OP profit from Program inception is negative or a loss then no payment will be made until the total cumulative OP is greater than zero or profitable.

3. A budget of expenses described in item 1 will be developed by the Parties and mutually agreed to in writing. Changes to the budget must be mutually agreed to in writing by the Parties. If there is no agreements then the MGB and Company agree to arbitrate pursuant to the Master General Broker Agreement of which this Schedule B is a part.

4. Company shall prepare monthly financial statements for the Programs no later than 20 days of month end. Each Party shall have 50 days from month's end to dispute or question the accounting. After the 50 days without challenge, the accounting becomes final and agreed to by each respective Party.

5. Incidental use of employees and resources from Company or from Program budgeted resources shall not be accounted for as a due to or from the Program until such time as they are readily ascertainable, not nominal in amount and/or are expected to be ongoing.

6. Payments under this Agreement are contingent upon and subject to the successful execution of Third Party Administrative agreements and other agreements as necessary to the Company's satisfaction to implement the Programs with employer groups, insurance carriers and other contracts as required by the Company to obtain the benefits of marketing the Programs.

7. Any other business opportunities the Parties may decide to pursue together shall be subject to a separate agreement with terms and conditions related to the particular situation.

IN WITNESS WHEREOF, The Parties have executed this Agreement on the Execution Date noted below.

On Behalf of:                                              On Behalf of:
BENEFIT AMERICA, LLC                          UNIVERSAL FIDELITY LIFE INSURANCE CO. INC.

| Member                    Date | Company Officer                    Date |
|---|---|

11

Schedule C
Confidentially and Privacy Agreement
Business Associates Agreement

This Business Associate Addendum (this "Addendum") between Universal Fidelity Life Insurance Company ("Covered Entity") and Benefit America, LLC ("Business Associate") is dated and effective as of July 1, 2009.

WHEREAS, COVERED ENTITY is disclosing and/or making available certain data, which may include Protected Health Information as that term is defined in 45 C.F.R. §164.301 ("PHI"), to BUSINESS ASSOCIATE to perform tasks on behalf of, and under the instructions of, COVERED ENTITY;

WHEREAS, COVERED ENTITY is or may be subject to the requirements of 42 U.S.C. 1171 *et seq.* enacted by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and regulations promulgated thereunder (65 Fed. Reg. 82462, *et seq.*, December 20, 2000, as modified by 67 Fed. Reg. 53183, August 14, 2002 (the "Privacy Rule"), and 63 Fed. Reg. 43242, August 12, 1998, as modified by 68 Fed. Reg. 8334, February 20, 2003 (the "Security Rule")).

NOW, THEREFORE, the parties agree as follows (terms used but not otherwise defined in this Addendum shall have the meanings assigned such terms as in the Privacy Rule):

BUSINESS ASSOCIATE may use and disclose PHI only as required to satisfy its obligations under the Master General Broker Agreement dated July 1, 2009, as permitted herein, or as required by law. BUSINESS ASSOCIATE shall not use or disclose PHI received from COVERED ENTITY in any manner that would constitute a violation of the Privacy Regulations if done by COVERED ENTITY.

BUSINESS ASSOCIATE agrees to take reasonable precautions to protect the PHI from loss, misuse and unauthorized access, disclosure, alteration and destruction.

BUSINESS ASSOCIATE shall, within thirty (30) days of becoming aware of any use or disclosure of PHI in violation of this Addendum, report any such use disclosure to COVERED ENTITY.

BUSINESS ASSOCIATE shall obtain and maintain an agreement with each agent or subcontractor that has or will have access to the PHI, which is received from, or created or received by BUSINESS ASSOCIATE on behalf of COVERED ENTITY, pursuant to which agreement such agent or subcontractor agrees to be bound by the same restrictions, terms and conditions that apply to BUSINESS ASSOCIATE pursuant to this Agreement with respect to such PHI.

Within twenty (20) days of notice by COVERED ENTITY to BUSINESS ASSOCIATE that COVERED ENTITY has received a request for an accounting of disclosures of PHI, other than related to the treatment of the patient, the processing of payments related to such treatment, or the operation of a covered entity or its business associate and not relating to disclosures made earlier than six (6) years prior to the date on which the accounting was requested, BUSINESS ASSOCIATE shall make available to COVERED ENTITY such information as is in BUSINESS ASSOCIATE's possession and is required for COVERED ENTITY to make the accounting required by 45 C.F.R. §164.528. In the event the request for an accounting is delivered directly to BUSINESS ASSOCIATE, BUSINESS ASSOCIATE shall within ten (10) days forward such request to COVERED ENTITY.

At COVERED ENTITY's request, BUSINESS ASSOCIATE shall make its internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by BUSINESS ASSOCIATE on behalf of, COVERED ENTITY available to the Secretary of the Department of Health and Human Services for purposes of determining COVERED ENTITY's compliance with the Privacy Regulations.

Unless otherwise limited herein, BUSINESS ASSOCIATE may: use the PHI in its possession for its proper management and administration and to fulfill any present or future legal responsibilities of BUSINESS ASSOCIATE, disclose PHI for the proper management and administration of the BUSINESS ASSOCIATE, provided that disclosures are required by law, or BUSINESS ASSOCIATE obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the BUSINESS ASSOCIATE of any instances of which it is aware in which the confidentiality of the information has been breached, use Protected Health Information to report violations of law to

12

appropriate Federal and State authorities, consistent with § 164.502(j)(1), aggregate the PHI in its possession with the PHI of other Covered Entities that BUSINESS ASSOCIATE has in its possession through its capacity as a Business Associate to the other Covered Entities, provided that the purpose of such aggregation is to provide COVERED ENTITY with data analysis relating to the Health Care Operations of COVERED ENTITY, de-identify any and all PHI provided that the de-identification conforms to the requirements of 45 C.F.R. § 164.514(b).

If BUSINESS ASSOCIATE conducts standard transactions (as defined in 45 C.F.R. Part 160) for or on behalf of COVERED ENTITY, BUSINESS ASSOCIATE will comply and will require by written contract each agent or contractor (including any subcontractor) involved with the conduct of such standard transactions to comply, with each applicable requirement of the Transaction Regulations (as set forth at 45 C.F.R. Parts 160 and 162). BUSINESS ASSOCIATE will not enter into, or permit its agents or contractors (including subcontractors) to enter into, any trading partner agreement in connection with the conduct of standard transactions for or on behalf of COVERED ENTITY that: (i) changes the definition, data condition, or use of a data element or segment in a standard transaction; (ii) adds any data elements or segments to the maximum defined data set; (iii) uses any code or data element that is marked "not used" in the standard transaction's implementation specification or is not in the standard transaction's implementation specification; or (iv) changes the meaning or intent of the standard transaction's implementation specification. BUSINESS ASSOCIATE agrees to participate in any test modification conducted by COVERED ENTITY in accordance with the Transaction Regulations.

BUSINESS ASSOCIATE agrees to implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that it creates, receives, maintains or transmits to or on behalf of COVERED ENTITY as required by the Security Regulations as set forth at 45 C.F.R. Parts 160 and 164, subpart C. BUSINESS ASSOCIATE specifically agrees to employ multiple security mechanisms to ensure the confidentiality, integrity and availability of the electronic data which is exchanged with COVERED ENTITY, including but not limited to authentication controls, authorization controls, audit controls and encryption, as requested by COVERED ENTITY. BUSINESS ASSOCIATE further agrees to ensure that any agent, including a subcontractor, to whom it provides such information, agrees to implement reasonable and appropriate safeguards to protect it. BUSINESS ASSOCIATE agrees to promptly report to COVERED ENTITY any security incident of which it becomes aware.

In the event that COVERED ENTITY determines that BUSINESS ASSOCIATE has materially breached the terms of this Addendum, COVERED ENTITY shall provide notice to BUSINESS ASSOCIATE of such material breach, and shall provide BUSINESS ASSOCIATE with a reasonable time to cure such breach, which shall not be less than thirty (30) days. In the event that the breach is not cured within the specified period, COVERED ENTITY may terminate this Addendum.

Upon termination of this Agreement, BUSINESS ASSOCIATE shall either return or destroy all PHI received from COVERED ENTITY or created or received by BUSINESS ASSOCIATE on behalf of COVERED ENTITY and which BUSINESS ASSOCIATE still maintains in any form. BUSINESS ASSOCIATE shall not retain any copies of such PHI. Notwithstanding the foregoing, to the extent that it is not feasible to return or destroy such PHI, the terms and provisions of this Agreement shall survive termination of this Agreement and such PHI shall be used or disclosed solely for such purpose or purposes which prevented the return or destruction of such PHI.

Compliance with the terms of this Agreement is a material term of any and all underlying agreements pursuant to which COVERED ENTITY is making available the PHI to BUSINESS ASSOCIATE and COVERED ENTITY. The parties understand and agree that termination of this Addendum shall constitute a default by BUSINESS ASSOCIATE under any and all such underlying agreements, and shall give rise to COVERED ENTITY's immediate right to terminate such underlying agreements.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum as of the day and year first written above.

Business Associate

On Behalf of:
BENEFIT AMERICA, LLC

Member                    Date

Covered Entity

On Behalf of:
UNIVERSAL FIDELITY LIFE INSURANCE CO., INC.

_____
Company Officer        Date

13

ELECTRONICALLY FILED
2014-Jul-24  16:00:32
60CV-14-2479
C06D05 : 2 Pages

## BEFORE THE INSURANCE COMMISSIONER
## FOR THE STATE OF ARKANSAS

IN THE MATTER OF
JOHN MATHIS LILE II
LICENSE NO. 36971

A.I.D. NO. 2009- 0 7 1

### CONSENT ORDER

On this day Jay Bradford, Arkansas Insurance Commissioner ("Commissioner") and John Mathis Lile II ("Respondent") reached an agreement concerning the resident insurance producer's and agency licenses issued to Respondent by the Arkansas Insurance Department ("Department"). The Department was represented by Robert Alexander, Associate Counsel. The Respondent voluntarily and intelligently waived his right to a hearing and consented to the entry of this Consent Order. The parties agreed as follows:

### FINDINGS OF FACT

1.  The Commissioner has jurisdiction over the parties and subject matter pursuant to Ark. Code Ann. §23-61-103, §23-64-216 and §23-64-512, among other laws.
2.  Respondent is licensed in Arkansas as a resident life and health insurance producer, license number 36971.
3.  The Arkansas Securities Department issued a Cease and Desist Order on June 18, 2009 against the Respondent and others making certain allegations related to the sales of securities for Ensurapet, Inc., formerly Vsurance, Inc. Respondent had resigned as the Vsurance president in November 2007, and has never been associated with its successor company, Ensurapet, in any way.
4.  Respondent is Chief Executive Officer and majority owner of Advanced Insurance Brokerage of America ("AIBA"), which is also a duly-registered third-party administrator in Arkansas.
5.  Until March 18, 2009, Respondent served as President and a minority owner of Cosmopolitan Life Insurance Company ("Cosmo").
6.  The Commissioner placed Cosmo into receivership on March 18, 2009. As a result of the Cosmo insolvency, consumers' medical bills have gone unpaid since there is no guaranty fund coverage for the self-insured Employers' Choice Health Plan ("ECHP").
7.  On or about August 12, 2009, Respondent voluntarily and of his own initiative surrendered both his individual producer's and agency licenses to the Department.

**EXHIBIT**

**3**

## ALLEGATIONS

The Department alleges that Respondent is or may be in violation of the following Arkansas Insurance Code provisions:

1. Ark. Code Ann. §23-64-216(a) which provides that a license may be suspended or revoked for violation of any of the causes listed in Ark. Code Ann. §23-64-512.
2. Ark. Code Ann. §23-64-512(a)(8);
3. Ark. Code Ann. §23-64-506(e)(1) &(2).
4. Respondent denies that he is in violation of these or any provisions of the Arkansas Insurance Code. However, in the interest of compromise and expediency, Respondent has agreed to enter into this Consent Order. In addition to voluntarily surrendering the aforementioned licenses, the Respondent has agreed not to seek licensure in any other state; and agreed not to sell, solicit or negotiate insurance products or services to consumers in Arkansas or any other state.

## CONCLUSIONS OF LAW

Based on the Findings of Fact and Allegations contained hereinabove, the Commissioner finds that it is in the best interests of Arkansas Insurance consumers and the parties to enter into this Consent Order accepting the Respondent's surrender of his Arkansas Insurance licenses.

**IT IS THEREFORE AGREED, ADJUDGED AND ORDERED AS FOLLOWS:**

1. The Department accepts the Respondent's voluntary surrender of the aforementioned licenses, and hereby considers those licenses to be revoked from this day forward.
2. On or about August 12, 2009, the Respondent voluntarily and of his own initiative surrendered and forwarded the aforementioned licenses to the Department.
3. The Department shall notify Respondent's appointing insurance companies of this action pursuant to Ark Code Ann. §23-64-217(a)(3).

IT IS SO ORDERED THIS 14th DAY OF SEPTEMBER, 2009.

JAY BRADFORD
INSURANCE COMMISSIONER
STATE OF ARKANSAS

JOHN MATHIS LILE II